UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
MEDITERRANEA DI NAVIGAZIONE SPA,   :        EFC

                    Plaintiff,     :
                                            06 Civ. 6700(JGK)

        -against-                  :

INTERNATIONAL PETROCHEMICAL GROUP  :        **DECLARATION OF**
S.A.                                        **WILLIAM CHETWOOD**

                    Defendant.     :
-----------------------------------x


        WILLIAM CHETWOOD, hereby declares:

        1.   I am a solicitor and a partner in the

London law firm of Bentleys, Stokes & Lowless, who are

the solicitors for Mediterranea Di Navigazione SpA

(Plaintiff herein) in the pending arbitration in London

against International Petrochemical Group S.A. (Defendant

herein). Arbitration has been a key part of my legal

practice since 1977. I have lectured on various legal

topics including the issue of obtaining security for

maritime claims.


        2.   I am fully familiar with the facts of this

matter and offer this declaration in opposition to

Defendant's motion to vacate the attachment of its

                            1

property done by Plaintiff in the instant case to obtain
security for an arbitration award against Defendant.

3.   More specifically, I wish to give evidence
on the subject of the well settled English law respecting
the relationship between an arbitration or exclusive
jurisdiction clause in a contract and ancillary
proceedings instituted outside the exclusive jurisdiction
venue, or within it, to obtain security.

## The Exclusive Jurisdiction Clause in This Case

4.   The charter party between Plaintiff and
Defendant contains an arbitration clause (the "Clause")
which provides, in pertinent part:

> Any and all differences and disputes
> of whatsoever nature arising out of
> this Charter shall be put to arbitration
> in the City of (London) pursuant to the
> laws relating to arbitration there in
> force.

## English Law

5.   Under English law the Clause is an
exclusive jurisdiction agreement precluding adjudication
of disputes arising under the charter other than by
arbitration in London.

2

6.   It is equally certain under English law that the Clause does not preclude the Plaintiff from instituting security proceedings in England, or elsewhere, in support of the arbitration.

7.   In *Bankgesellschaft Berlin AG v. First International Shipping Corporation Limited* [2001] CP Rep 62, a decision of the Admiralty Division of the English Commercial Court, Mr. Justice Langley held that:

> ...exclusive jurisdiction clauses are generally now to be construed so as not to exclude [i.e., to permit] applications for ancillary relief made in other jurisdictions, at least in the absence of express contractual provisions such as those which appeared in the agreement which was before the Court of Appeal in the case of *Mantovani v. Carapelli SPA*...

Copies of the *Bankgesellschaft* and *Mantovani* decisions are attached hereto as, respectively, Exhibits 1 & 2.

8.   The agreement in *Mantovani,* which was found to prevent ancillary proceedings for security until the arbitration in London was completed, read: (at pages 379-380)

> (a)   Any dispute arising out of or under this contract shall be settled by arbitration in London in accordance with the Arbitration Rules. No. 125,

3

of the Grain and Feed Trade Association
Limited, such Rules forming part of
this contract and of which both parties
hereto shall be deemed to be cognisant.

(b)   Neither party hereto...shall bring any
action or other legal proceedings against
the other of them in respect of any such
dispute until such dispute shall first
have been heard and determined by the
arbitrators...and it is expressly agreed
and declared that the obtaining of an
award...shall be a condition precedent
to the rights of either party hereto...
to bring any action or any other legal
proceedings against the other of them
in respect of any such dispute.

It should be noted that the reason the court
held that proceedings in Italy instituted in that case to
obtain security for the arbitration in London were in
breach of the arbitration clause was the express
prohibition on "any action or any other legal
proceedings" in the second half of the clause, not the
agreement to arbitrate in the first part of the clause.
Clauses expressly making completion of the arbitral
process a condition precedent to all proceedings have
been recognized as valid since the case of Scott v Avery.
[(1856) 5 H.L.C. 811]

9.   The other (more common) type of exclusive
jurisdiction clause–where ancillary proceedings are not
expressly excluded––is found and discussed in the case of
*In Re Q's Estate* [1999] 1 Lloyd's Rep. 931:

4

This Agreement shall be governed by and
construed in accordance with the pro-
visions of English Law.  Any disputes
deriving [from] or in connection with
this agreement will be submitted to the
exclusive jurisdiction of arbitration
in London under the London Arbitration
Act as amended.

10.   The plaintiff obtained an injunction from
the court in London with respect to certain assets, and
the defendant objected, arguing that the exclusive nature
of the arbitration clause with respect to "Any disputes
deriving [from] or in connection with this agreement..."
forbade ancillary proceedings.

11.   The court disagreed, saying, at pages 935-
936:

In my judgment that submission is a non-
sequitur [in that] it would produce sur-
prising results.  It would mean that
ancillary proceedings, e.g. for security
for a claim, were always within an arbitra-
tion clause, for it would always be possible
to say that the claim for relief was in
respect of an underlying substantive dis-
pute which the parties had agreed to ar-
bitrate.

*  *  *  *  *  *  *

It would also mean that any arbitration
agreement would, even in the absence of
the language in clause 26(b), have pre-
vented the obtaining of ancillary relief
anywhere in the world, a conclusion which
appears to fly in the face of reality.

5

A copy of *In Re Q's Estate* is attached hereto as Exhibit 3.

## Conclusion

12.   *In Re Q's Estate* discusses other cases involving exclusive jurisdiction clauses and ancillary proceedings.  Indeed, there are many English cases on this subject, but I need not refer to them because their teaching is summarized in the holding in *Bankgesellschaft* quoted in paragraph 7 above.  That is, under English law an exclusive jurisdiction clause does not prevent ancillary proceedings for security in support of arbitration, absent express language to the contrary.

13.   The Clause in the instant case does no more than refer disputes to arbitration and obviously does not contain any language which could be construed as forbidding ancillary proceedings.  If a clause that referred disputes to "the exclusive jurisdiction" (my emphasis) of arbitrators did not prevent the granting of ancillary relief, a clause simply referring to the laws relating to arbitration in London clearly would not.

14.   I have read the affidavit of Robert Robinson Wilson, Esq. dated March 7, 2007 submitted with

6

Defendant's motion to vacate the attachment.  I believe
that he has broadly correctly stated the procedural
provisions of English law respecting applications in
England for "freezing orders", and that he acknowledges
that Plaintiff would not be debarred by the Clause from
applying to the English court for such ancillary relief,
although he does maintain that the court would not grant
the relief for other reasons.

15.  I also believe that Mr. Wilson would not
disagree with what I have said in this declaration.

Pursuant to 28 U.S.C. §1746, I declare under
penalty of perjury under the laws of the United States
that the foregoing is true and correct.

Dated at London,
March 22, 2007

William Chetwood

7

# Exhibit 1

[2001] C.P. Rep. 62
2000 WL 1480135 (QBD (Adm Ct)), [2001] C.P. Rep. 62

Bankgesellschaft Berlin AG v. First International
Shipping Corporation
Ltd.
No.2000 Folio 894

Admiralty Division Commercial Court
QBD (Adm Ct)
Before: Mr. Justice Langley
September 21, 2000

Anti-suit injunction - exclusive jurisdiction clause -
proceedings in other jurisdiction alleged to have
been brought in bad faith - effect of exclusive
jurisdiction clause on ancillary relief application in
other jurisdiction

The claimant bank had a charge over the shares of
two Bermudan companies, which owned the shares
of six ship owning companies. The bank's security
was principally to be found in a loan agreement
dated December 9, 1993. It also had as one of the
security documents, also dated December 9, 1993 a
charge over the shares of the two companies. The
bank lent $10 million to the defendant company as
a very small part of the overall financial
arrangements for the vessels. The defendant
company was the parent company of the two
companies in which the shares were charged to the
bank. The vessels were demise chartered to Shell
on a 14 year demise with an option for Shell to
terminate after seven years. Shell exercised the
option and the charters were therefore due to end in
March and June of 2001. The bank gave notice in
late July 2000 that the notification of termination of
the charters by Shell was an event of default under
the loan agreement. In early August, the bank
issued proceedings for a declaration that an event
of default had occurred. The defendant company
disputed that any event of default had occurred. It
was the marketing of the vessels which was at the
heart of the dispute between the parties. The bank
said that it or a purchaser of the shares from it was
entitled to play a role in or to influence that
exercise as owner of the shares in the intermediate
companies. The defendant company said that it was
not so entitled and, in any event, only the bond
holders could control the marketing.

Following the issue of proceedings, there were
negotiations in which the defendant company
sought the bank's agreement not to exercise its
security rights pending the resolution of the
dispute. The bank, having appointed receivers
under the share charge, sought agreement on an

early determination of an application it had issued
for summary judgment on the issue and sought
information about the marketing steps in fact being
taken by the defendant company. The negotiations
broke down. On September 4, 2000 the bank gave
notice that it would seek to enforce its security and
exercise its rights over the shares, albeit making
plain that nothing would or could be done to that
end immediately.

Thereafter, the defendant company, which was also
a Bermudan company, issued proceedings in the
Supreme Court of Bermuda against the receivers
appointed by the bank in which it sought -- and on
September 8, 2000 obtained *ex parte* -- relief
restraining the receivers until September 29 from,
in effect, exercising any rights over the shares in
the two companies which are charged to the bank.

The bank sought an anti-suit injunction in the
English courts and, in particular, an order requiring
the defendant company to apply forthwith to
discharge the injunction granted by the Supreme
Court of Bermuda, relying on two grounds. First,
that the proceedings were brought in breach of an
exclusive English jurisdiction clause said to be
found in the loan agreement and, second, on the
ground of vexation and oppression as the
Bermudan proceedings were said to have been
brought in bad faith.

Held, that once the bank had commenced its
proceedings in the English jurisdiction the effect of
clause 21.2 in the loan agreement was that the
English courts had exclusive jurisdiction over the
claims, including claims under the share charge
agreement. The Bermuda jurisdiction clause in the
share charge agreement expressly permitted the
bank to start proceedings in other jurisdictions. A
court should try to avoid inconsistencies in
agreements signed on the same date and relating to
the same transaction. Bearing in mind that the loan
agreement was the master agreement, reconciliation
could sensibly and commercially be achieved by
operating the provisions of the loan agreement as
written when the English proceedings were started.
That involved no breach of the share charge
agreement and gave effect to the stated intention of
both jurisdiction clauses which were for the
exclusive benefit of the bank.

Exclusive jurisdiction clauses were generally to be
construed so as not to exclude applications for
ancillary relief made in other jurisdictions but for

relief to be truly ancillary it had to be supportive of the proceedings in the principal jurisdiction and must be such that there was an obvious or at least good reason for seeking such relief elsewhere in support of those proceedings. In the present case, the Bermudan proceedings were pursued in an attempt to circumvent or emasculate the jurisdiction clause in the loan agreement and not to support it or the proceedings in England.

However, in the absence of an exclusive jurisdiction clause, the bank would not have made out a case for relief despite the fact that in terms of expense, delay, issues and common sense there was nothing rational to justify the issue of the proceedings in Bermuda. That was not sufficient to justify the extreme step of the English court seeking to restrain proceedings otherwise properly brought in another jurisdiction.

Where there is a valid exclusive jurisdiction clause, the courts should give effect to it unless there were strong reasons for not doing so. In the present case, there were no such strong reasons.

Ocarina Marine Ltd v. Marcand Stein & Co.[1994] 2 Lloyds Rep. 524.

Banque Cantonale Vaudoise v. Water Lily Maritime Inc [1997] 2 Lloyds Rep. 347.

Mantovani v. Carapelli SPA[1980] 1 Lloyds Rep. 375.

Donohue v. Armco Inc [2000] 1 Lloyds Rep. 579.

Representation

Mr. R. Hacker, Q.C. and Mr. P. Wright (instructed by Messrs. Watson Farley & Williams) appeared on behalf of the Claimants.

Miss C. Blanchard (instructed by Messrs. Sinclair Roche & Temperley) appeared on behalf of the Respondents.

JUDGMENT

Mr. Justice Langley:

Although this matter has come before the court in a very short timescale and has involved considerable reading, argument and submissions over more than a court day, as the matter is said to be, at least by the bank, one of some urgency, I will now express my conclusions in fairly short form and inevitably

without the refinements or addressing all the points which have been raised which would have been appropriate in a reserved judgment.

I have reached the conclusion that the bank is entitled in principle to the relief which it seeks by way of an anti-suit injunction. The facts, put as briefly as I think necessary, are that the bank has a charge over the shares of two Bermudan companies, which companies own the shares of six ship owning companies. The vessels themselves are charged to the holders of bonds which were issued to provide the very great majority of the financing for their construction. The bank's security is principally to be found in a loan agreement dated 9th December 1993. It also has as one of the security documents and also dated 9th December 1993 a charge over the shares of the two companies.

The bank lent $10 million to the defendant company as a very small part of the overall financial arrangements for the vessels. The defendant company is the parent company of the two companies in which the shares are charged to the bank.

The vessels were demise chartered to Shell on a 14 year demise with an option for Shell to terminate after seven years. Shell has exercised the option. The charters will therefore end in March and June of next year.

The bank gave notice in late July of this year that the notification of termination of the charters by Shell was an event of default under the loan agreement. In early August, it issued proceedings in these courts for a declaration that an event of default had occurred.

The defendant company disputed and disputes that any event of default has occurred. The defendant company is obliged under an agreement with the trustee for the bond holders in the event of termination of the charters by Shell to market the vessels, and to do so, putting it very broadly, in an endeavour to ensure continuing service of the bonds and, if achievable, a return which would also enable the bank to be repaid and achieve an equity in the shipowning and other companies in the chain.

It is the marketing of the vessels which seems to lie at the commercial heart of this dispute. The bank says that it or a purchaser of the shares from it is entitled to play a role in or to influence that exercise as owner of the shares in the intermediate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

companies.

The defendant company says that it is not so entitled and, in any event, only the bond holders can control the marketing, which the evidence suggests is being pursued by the defendant company at the present time.

There is no doubt that Miss Blanchard is right in her submission that the relationship of the bank and Mr. Paul Slater, who is the moving force behind the defendant company, has broken down and broken down in a context in which one would expect that their interests were the same, namely the achievement of the best possible placing of the vessels in the circumstances which have arisen.

There is also no doubt that, as indeed one would expect, it is the bond holders whose interests are paramount in the closely drawn provisions of the agreement for the marketing of the vessels and it is right that I should say that I remain uncertain as to whether the bank, or indeed a purchaser from it, if one could be found, could ever play any real part in the exercise, but I do accept that in the context to which I have referred the bank has real concerns to protect its position as far as it can.

Following the dispute arising between the bank and the defendant company over whether or not an event of default had occurred and the issue of proceedings, there were negotiations in which the defendant company sought the bank's agreement not to exercise its security rights pending the resolution of the dispute, on which of course the bank's rights were dependent.

The bank, having appointed receivers under the share charge, sought agreement on an early determination of an application it had issued for summary judgment on the issue and sought information about the marketing steps in fact being taken by the defendant company.

The negotiations broke down. On 4th September the bank gave notice that it would seek to enforce its security and exercise its rights over the shares, albeit making plain that nothing would or could be done to that end immediately.

It was in these circumstances that the defendant company, which is also a Bermudan company, issued proceedings in the Supreme Court of Bermuda against the receivers appointed by the bank in which it sought -- and on the 8th September obtained ex parte -- relief restraining the receivers until the 29th September from, in effect,

exercising any rights over the shares in the two companies which are charged to the bank.

The bank now comes to this court seeking an anti-suit injunction and, in particular, an order requiring the defendant company to apply forthwith to discharge the injunction granted by the Supreme Court of Bermuda. The bank seeks that relief on two grounds. First, that the proceedings are brought in breach of an exclusive English jurisdiction clause said to be found in the loan agreement and, second, on the ground of vexation and oppression as it is submitted that the Bermudan proceedings have been brought in bad faith.

Exclusive jurisdiction.

The jurisdiction clause in the loan agreement, clause 21.2, is in a form substantially similar to that considered in the cases of Ocarina Marine Ltd. v. Marcand Stein & Co. [1994] 2 Lloyds Rep. 524 and Banque Cantonale Vaudoise v. Water Lily Maritime Inc. [1997] 2 Lloyds Rep. 347.

I am satisfied that Mr. Hacker is right in his submission that once the bank had, as it did, commenced its proceedings in this jurisdiction the effect of the clause was that these courts had exclusive jurisdiction over the claims, including claims under the share charge agreement.

That was the conclusion reached in those cases and I see nothing of substance to enable the wording in this agreement to be distinguished from them.

Miss Blanchard took two points. First she submitted that as the share charge agreement itself contains a similar clause but specifying the relevant courts as the courts of Bermuda and not of this country, the defendant was entitled if not in fact obliged to pursue the receivers in Bermuda. Secondly she submitted that in any event an exclusive jurisdiction clause does not preclude applications for ancillary relief being made in another jurisdiction provided it was acknowledged that the substantive dispute remained one for the jurisdiction of the court whose jurisdiction was otherwise exclusive. And, she submits, that is all that the defendant company has sought in the courts of Bermuda.

I do not accept either submission as providing an answer in the circumstances of this case.

As to the Bermuda jurisdiction clause in the share charge agreement, it expressly permits the bank to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

start proceedings in other jurisdictions. The bank did that when it started proceedings in this court.

If, as I think right, a court should try to avoid inconsistencies in agreements signed on the same date and relating to the same transaction and bearing in mind that the loan agreement can fairly be described as the master agreement, then I think reconciliation can sensibly and commercially be achieved by operating the provisions of the loan agreement as written when the English proceedings are started. That involves no breach of the share charge agreement and gives effect to the stated intention of both jurisdiction clauses that they are for the exclusive benefit of the bank.

As to exclusive jurisdiction clauses not excluding applications for ancillary relief in other jurisdictions, Miss Blanchard has emphasised that the effect of the relief obtained in Bermuda is only to prevent the bank exercising rights over the shares until this court determines, if it does, that there was an event of default.

I also accept her submission that exclusive jurisdiction clauses are generally now to be construed so as not to exclude applications for ancillary relief made in other jurisdictions, at least in the absence of express contractual provisions such as those which appeared in the agreement which was before the Court of Appeal in the case of Mantovani v. Carapelli SPA [1980] 1 Lloyds Rep. 375.

But, as Miss Blanchard also submitted, for relief to be truly ancillary for this purpose it must be properly characterised as supportive of the proceedings in the principal jurisdiction and, in my judgment, must be such that there is an obvious or at least good reason for seeking such relief elsewhere in support of those proceedings. That, in my judgment, is not at all an appropriate description of the proceedings in Bermuda in this case.

No reason has been put forward by Miss Blanchard for the proceedings being taken there, let alone being taken there without notice to the bank. When pressed, her answer was that they were issued there because the defendant company was entitled to do so, which of course begs the question. If the defendant company was properly entitled to such relief, it could and I think should have been sought in this jurisdiction. This court could have granted effective relief if it was properly claimed, albeit not, I apprehend, on a without notice basis. Indeed, that could still be done if the defendant company

was so advised, as Miss Blanchard herself said.

In reality I think, as Mr. Hacker submitted, that the Bermudan proceedings were pursued in an attempt to circumvent or emasculate the jurisdiction clause in the loan agreement and not to support it or the proceedings in this country, and I think the words of the clause themselves are wide enough to cover such proceedings and thus to put the defendant company in breach of the clause by issuing them.

It is unnecessary for me, in view of this conclusion, to express a concluded view on the alternative basis on which the bank seeks to found its application, namely bad faith. That question would, of course, have to be considered on the basis that there was no exclusive English jurisdiction clause. Miss Blanchard rightly points to the fact that the Supreme Court of Bermuda was in no sense exercising an exorbitant jurisdiction as the relevant asset is legally situated in Bermuda and two of the three parties were Bermudan. Further, the very fact that the share charge agreement does provide for Bermudan law and jurisdiction shows that the parties recognised a real connection with Bermuda.

Whilst I see force in Mr. Hacker's submission that the proper inference is that the Bermudan proceedings were issued in a cynical attempt to obtain ex parte relief which could not have been obtained from this court and which, if obtained, would for logistic reasons, as the evidence suggests, prove very difficult to discharge, I am not persuaded that, absent an exclusive jurisdiction clause, the bank would have made out a case for relief and that is so despite my conclusion that in terms of expense, delay, issues and common sense there is nothing rational to justify the issue of the proceedings in Bermuda. That, in my judgment, would not be sufficient to justify the extreme step of this court seeking to restrain proceedings otherwise properly brought in another jurisdiction.

That brings me finally to the question of overall discretion. Where there is, as I have held there is, a valid exclusive jurisdiction clause the court should give effect to it unless there are strong reasons for not doing so (see the judgment of Stuart-Smith L.J. in Donohue v. Armco Inc. [2000] 1 Lloyds Rep. 579 at 588 to 589) there are no strong reasons in this case, rather the contrary.

The factors to which I have referred as to the rationale or lack of it for the defendant company proceeding in Bermuda strongly support the grant of relief. The only factor which could perhaps go in the scale on the other side is that, as I have said, I

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

remain uncertain whether, if the bank does enforce its rights, risking of course an adverse decision on the event of default issue, it will in fact find it has achieved any real benefit. But that, in my judgment, is nowhere near sufficient to justify refusal of the relief to which I have held its contract entitles the bank.

As Miss Blanchard indicated, the precise wording of any relief to be granted in the event that I decide it is appropriate to do so would require debate. I will hear the parties on that question and any other matters they may wish to raise as to the future progress of the proceedings.

MR. HACKER: My Lord, I am grateful for your Lordship's decision. In relation to the form of the order which we seek, that is set out in our notice of application.

MR. JUSTICE LANGLEY: Just give me a moment and I will find it.

MR. HACKER: Tab 1.

MR. JUSTICE LANGLEY: Yes, I have it.

MR. HACKER: My Lord, we approach the formulation of relief on the basis that it is said that the Bermudan proceedings served no purpose other than as a vehicle within which to make the injunction application. My Lord, we think it reasonable and indeed we submit that the interests of justice require that the Bermudan injunction should be discharged and, my Lord, either we can do that with the other side's consent or they can do it. So your Lordship can either order them to do it and to consent to an application which we make --

MR. JUSTICE LANGLEY: Meaning that (1) could either read as it is or be left to both of you.

MR. HACKER: Achieving the same result. My Lord, as to (2), we would suggest to your Lordship that that is a perfectly appropriate and sensible order to make. Your Lordship is being asked to make an order in personam against the defendant. In those circumstances, there is nothing in principle which is objectionable to your Lordship ordering that the proceedings be discontinued. My Lord, certainly from my recollection of the other part of Laker, the order which the Court of Appeal made, which was ultimately reversed by the House of Lords on other grounds, was that Laker should discontinue its proceedings in the District Court in the States.

MR. JUSTICE LANGLEY: Shall I hear Miss Blanchard and what she says about those questions first or do you want to go on and deal with the future first?

MR. HACKER: No, my Lord.

MISS BLANCHARD: My Lord, in terms of (1), two things concern us about it. First of all, it requires us to apply forthwith. The upshot of the claimant's evidence is that it is very difficult to get on before the Bermudan court, although that is not our evidence. We are very anxious for your Lordship not to make an order that is incapable of applying. Certainly it seems to me likely that we should apply or issue the appropriate application -- I confess I do not know what the form is — in fairly short course. Obviously, we would do our best to get it on as soon as possible.

MR. JUSTICE LANGLEY: I suppose Mr. Hacker's alternative suggestion -- I would be surprised if there is not a procedure there that consent orders, as it were, get signed off on paper.

MISS BLANCHARD: My Lord, I would be equally surprised.

MR. JUSTICE LANGLEY: It may be that the sensible thing is that you should be ordered to sign a consent form to the effect that the injunction should be discharged and it may be that the bank would prefer to have the carriage of producing that consent to the court in Bermuda, or it may be you can do it together, I do not mind. I hear what you say, but I would, as I say, be somewhat surprised if a consent order could not be produced forthwith, meaning, as it were, as quickly as you can do it sensibly.

MISS BLANCHARD: My Lord, yes. The second point is as to when it becomes effective, because it will come as no surprise that I am going to be making an application, hopefully, for permission to appeal. In the event your Lordship was minded to grant that, the right order, we would say, would be for there to be no steps taken pending that appeal. That is what I have to say about (1).

As to (2), my only concern about it is, usually the form of the order being an injunction is to restrain us from pursuing the proceedings rather than ordering us to formally discontinue them, although I suspect it does not make much difference at the end of the day.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MR. JUSTICE LANGLEY: If it does not make much difference, why does it matter?

MISS BLANCHARD: My Lord, I was surprised to see it expressed in that way. Ordinarily it would be expressed --

MR. JUSTICE LANGLEY: Can you give me a good reason why you should not be ordered to apply forthwith to discontinue, apart from the fact that you say I have got it wrong?

MISS BLANCHARD: My Lord, the right order usually would be to state -- because the situation may change and there may come a time at which it is appropriate for us to be in Bermuda.

MR. JUSTICE LANGLEY: What do you say about that?

MR. HACKER: My Lord, as to (1), having heard what my learned friend says, we would very much prefer to have carriage of what happens in Bermuda. We would ask your Lordship as a variant on (1) for an order that the defendant signifies its consent to the discharge of the injunction in whatever form is necessary. My Lord, we would hope they could do that immediately after the hearing and there should be no delay.

MR. JUSTICE LANGLEY: You will need to draft something appropriate to cover that. That seems to me to meet it, subject to the leave to appeal point. What about discontinue against stay?

MR. HACKER: My Lord, as it is suggested that the proceedings serve no purpose other than to obtain this injunction, what is the point in the proceedings being there, cluttering the court's file up, cluttering everybody's perception of the litigation up?

MR. JUSTICE LANGLEY: What you mean is, if it ever turned out that such proceedings were appropriate, these ones plainly were not because they had an objective which this court has held is not the right objective.

MR. HACKER: Absolutely. There would be no question of res judicata or any point being taken of the fact that there had been proceedings which had been discontinued. There would not be any issue about that. So, my Lord, we suggest that the sensible course, given the stated objective and purpose of the proceedings is that they should terminate, not be left.

MR. JUSTICE LANGLEY: You have persuaded me, Mr. Hacker. I cannot myself see any great practical difference in any event. In that case, whilst the question of permission to appeal is being dealt with, it would be sensible if somebody behind you was drafting what you would think to be an appropriate order. I suspect it would be sensible, if it could be done, that a form of consent to be signed by both of you in the terms which you think are appropriate were to be drafted so that the order would then take the form that the defendant execute that form of consent forthwith, and "forthwith" in this case would mean immediately, I suspect.

MR. HACKER: My Lord, I am obliged.

MR. JUSTICE LANGLEY: Right, permission.

MISS BLANCHARD: Permission, my Lord. I have come armed with the relevant extract from the CPR. The test for your Lordship is whether your Lordship considers that the appeal will have a real prospect of success or that there is some other compelling reason why the appeal should be heard.

As to (1), your Lordship heard my submissions yesterday and I am not going to repeat them. I will say only this. Your Lordship has gone wrong in two essential respects. First of all, in approaching the question from the standpoint as to what we are doing in Bermuda as opposed to approaching it from the standpoint of could my learned friend show a reason why we should not be there, which we would say is the wrong approach -- equally, my Lord, we would say that your Lordship has got it wrong on the exclusive jurisdiction clause and, perhaps more importantly and crucially, an error of principle as regards the question of interim relief. Your Lordship has found that ordinarily an exclusive jurisdiction clause does not prevent that, but has applied the relevant decisions on that to the effect that ... is not covered by that. We would say in that respect, perhaps more than any other, your Lordship has gone awry.

MR. JUSTICE LANGLEY: That is the ancillary point; is that what you mean?

MISS BLANCHARD: My Lord, yes. That is an important point of principle because I would venture to suggest that, having found that ancillary relief is not prima facie prevented, your Lordship then felt able to go on to find ... it was prevented would come as a surprise to a great many practitioners. We say fundamentally that is wrong.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-06700-JGK Document 19 Filed 03/23/07 Page 15 of 53

For those reasons we say we have a real prospect of success on appeal, but, even if your Lordship was not satisfied about that, we say that there are important points of principle which have been raised in the context of this case, so that it is appropriate for the Court of Appeal to consider.

MR. HACKER: My Lord, we suggest to your Lordship that the matter is ultimately one of discretion and your Lordship has exercised his discretion in our favour and the case is not appropriate for an appeal.

MR. JUSTICE LANGLEY: I shall refuse permission to appeal in this case. I do think the matter is ultimately one of discretion and also I am not persuaded that there is a real prospect of an appeal succeeding, so you must make your application elsewhere if you are minded to do so.

MISS BLANCHARD: My Lord, as a matter of form, I think I have to formally ask your Lordship for a stay of the order pending our application to the Court of Appeal.

MR. JUSTICE LANGLEY: Miss Blanchard, I suspect -- and Mr. Hacker will be listening to this -- that the consequences of today will not be immediate: they have already said to you, admittedly some little while ago, that nothing is likely to happen in the immediate span of time, but if I was to refuse you a stay it has, to my mind, the salutary effect that if you are going to go to the Court of Appeal you will have to go very quickly if you are going to seek to upset the decision which I have delivered. Why I am mentioning this in Mr. Hacker's presence is that if that were to happen I would not expect, without any formal order, the bank to do anything which would be terminal or potentially terminal as regards their interests. But by going very quickly I mean just that. Mr. Hacker, do you want to comment on that?

MISS BLANCHARD: My Lord, before Mr. Hacker does so, I am asking your Lordship for a stay because I must ask your Lordship before I ask the Court of Appeal for it. The upshot of the order is that we are to be required to sign something outside which requires us to do it immediately. There is no need for that sort of unseemly haste about it.

MR. JUSTICE LANGLEY: It still has to go before the court in Bermuda, even once you have signed it, if I may put it in that way.

MISS BLANCHARD: My Lord, it does and as to whether the claimant's pessimism as to when these matters would be got before the court in Bermuda turns out to be justified or not, we shall seek in due course --

MR. JUSTICE LANGLEY: When would you be able to make an application to the Court of Appeal for either a stay or indeed for permission?

MISS BLANCHARD: My Lord, we would need to take instructions, obviously, and we would invite your Lordship to stay the order only for a short period, perhaps seven days, to give us an opportunity --

MR. JUSTICE LANGLEY: I am trying to think what day of the week it is today. I have had a bad week.

MISS BLANCHARD: Thursday. It will give us an opportunity to take instructions and to consider our position and also to consider whether we do in fact want to make an application in this court, which is still open to us. There is not the kind of screaming haste about this and it would not occasion any prejudice if your Lordship was to give us that short indulgence.

MR. JUSTICE LANGLEY: May I now ask Mr. Hacker what he says about this?

MR. HACKER: My Lord, what I say is, we have heard what your Lordship says and those behind me have heard it. The effect of your Lordship's finding is that our legal rights have been infringed by the commencement of these proceedings, albeit that the question of injunction is ultimately a matter of discretion. My Lord, we would suggest to your Lordship that it is inappropriate that the court consider any application for a stay unless some good reason is made out for the need for a stay. My Lord, it is at the moment 7 o'clock in the morning in Bermuda and there is realistically no prospect of this matter getting before the Bermuda court before certainly the close of court business in London today. My Lord, I do not know what the position will be tomorrow. I would guess that probably there would be no difficulty in terms of the consent order and getting it dealt with.

MR. JUSTICE LANGLEY: What is the difference in time?

MR. HACKER: They are four hours behind us, so

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-06700-JGK c Document 19    Filed 03/23/07    Page 16 of 53

it is 8 o'clock. My Lord, realistically I do not think I would have any great difficulty getting instructions to indicate to your Lordship that we would not do anything before the Court of Appeal could be moved this afternoon if my learned friend wants to move the Court of Appeal this afternoon.

MR. JUSTICE LANGLEY: She does, fairly I would have thought, say in context that she will need to take instructions as to whether she wishes to take that step or not, Mr. Hacker, and I do have some difficulty in seeing how the bank could seriously be prejudiced. I am not resiling from the fact that the consent, if that is what one comes up with, should be signed now. It is a question of whether operating on that consent should, either as a matter of agreement or as a matter of court order be stayed for, I would have thought, sufficient time for instructions to be taken and for her to see whether an application to the Court of Appeal could be progressed. The thought had gone through my mind at mid-day on Monday that — and I also cannot see there is any huge prejudice to the bank from that sort of timescale.

MR. HACKER: My Lord, all I can say in response to that is that the other side have known right from the beginning of this that we regard this as a matter of considerable urgency. My Lord, they must have foreseen the possibility that your Lordship's decision would be as it was.

MR. JUSTICE LANGLEY: There is no point in debating this much further, but there is a difference between a possibility and actually positively taking instructions that this matter go further. It may be in your interests that they should have an opportunity to consider that at least without a gun in their back.

MR. HACKER: My Lord, we can cut matters short. I am told Monday mid-day, Monday lunchtime, would not be a problem.

MISS BLANCHARD: My Lord, can I add this? As your Lordship knows from the evidence, we had real difficulty getting instructions to deal with this application never mind —

MR. JUSTICE LANGLEY: Miss Blanchard, I am sorry but I am simply not going to be impressed by that.

MISS BLANCHARD: My Lord, that was the position and the second point is this. I could not go to the Court of Appeal, for example, this afternoon and tell them that it was that urgent that they had to hear me now. The urgency arises only in terms of

how long your Lordship is prepared to stay the order for, if your Lordship is prepared to do that.

MR. JUSTICE LANGLEY: Miss Blanchard, I am not prepared to issue a formal stay on two bases. One, that I intend to make an order that you should sign off on a consent form, assuming we can get one into a reasonable form, and to do so forthwith. I am assuming your instructing solicitors are authorised to do that or somebody who is here is authorised. Secondly, on Mr. Hacker, in effect, giving me an informal undertaking, which I would expect him and I am sure his clients to honour, that they will not take any steps in relation to that consent form until mid-day on Monday our time here.

MISS BLANCHARD: I am grateful.

MR. HACKER: My Lord, that I think leaves two matters, one the costs of the application. We would ask for those costs.

MR. JUSTICE LANGLEY: Can you oppose that?

MISS BLANCHARD: I do not resist that, no.

MR. HACKER: And secondly whether or not your Lordship is prepared to give any directions as to the further conduct of the proceedings. My Lord, we discussed in general terms yesterday the question of expedition. We would suggest to your Lordship that notwithstanding that what we are looking for in terms of the discharge of the injunction in Bermuda, nonetheless it is in the interests of both parties -- and there is an element of urgency in this matter being resolved and we would ask your Lordship to order and give directions in relation to an expedited trial of the action.

MR. JUSTICE LANGLEY: First of all, do you mean by that that you do not wish to pursue your summary judgment application?

MR. HACKER: Not if we can have an expedited trial. My Lord, the summary judgment application was issued at a time before the new issues of fact, if I can put it in that way, were raised.

MR. JUSTICE LANGLEY: Do you quarrel with an estimate of -- is it four days?

MISS BLANCHARD: I said three to five, my Lord.

MR. HACKER: I do not quarrel seriously with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

shorter estimate. I think I would not accept the longer end of the estimate. Our estimate would probably be two, three or four days.

MISS BLANCHARD: My Lord, can I remind your Lordship that Mr. Hacker's estimate for this application was two hours. My estimate was one day.

MR. HACKER: I have not won on the estimates, I accept.

MR. JUSTICE LANGLEY: Four to five days I would have thought was a sensible estimate. I think that is probably right. What are you actually asking for?

MR. HACKER: My Lord, we would be asking that your Lordship order that the matter be tried as soon as possible from the court's point of view after the expiry of something like 10 to 14 days to enable the parties to prepare for trial. My Lord, we still think this matter can be prepared for trial within that sort of timescale, given good will on both sides. If the parties want to, they can have the matter ready for trial.

MR. JUSTICE LANGLEY: If I saw fit to order that this matter should be expedited, the court will do its very best to see that that happens, which I suspect would mean that realistically you would be very unlikely to get a date before December whatever happens, if I can put it that way.

MR. HACKER: Even with expedition.

MR. JUSTICE LANGLEY: Even with expedition. That was some information that I gleaned. Miss Blanchard is, I am sure, now going to say to me that it is all less urgent in any event, if it ever was.

MISS BLANCHARD: My Lord, the only urgency ever relied on was that it was said the bank was being precluded from exercising its rights. The prohibition has gone and there is simply no urgency left.

MR. JUSTICE LANGLEY: There are a number of possibilities, are there not? There is the possibility that you might succeed on appeal; there is the possibility that you might be advised to take injunctive proceedings here; there is the 31st December deadline under the agreement. All those are matters which suggest to me, in the context of the exchanges which we had yesterday, that it is in everybody's interests that this matter should be

resolved on the merits, if that is the right expression, with as much expedition as possible.

MISS BLANCHARD: My Lord, I was going on to say that I do not resile from my position yesterday that we are prepared to co-operate within a reasonable timescale, but the idea that this matter can be brought on for trial in 10 to 14 days is absolutely hopeless.

MR. JUSTICE LANGLEY: Yes, I think I am sympathetic to that. It seems to me that the probable timescale one should be aiming for is that this court would order that this matter should be given an expedited trial and if possible before the end of this term and that we should come up with a timetable for the service of -- I do not know where we are on pleadings, evidence and goodness knows what else besides. One should come up with an estimate of four to five days. One should come up with a timetable for the service of any pleadings, disclosure, evidence which would meet a date such as the 30th November as a date when you would be ready and everything would be there.

MISS BLANCHARD: My Lord, can I invite your Lordship to make the order in terms of it being fixed not before.

MR. JUSTICE LANGLEY: It would certainly be on the basis of its being expedited to be heard not before, if it was 30th November, the 1st December, assuming that is not a Sunday. That sort of target.

MISS BLANCHARD: My estimate yesterday was that it would take us two to three months and that was a realistic estimate. I would suggest perhaps that your Lordship could try and have it fixed for the beginning of next term.

MR. JUSTICE LANGLEY: No, Miss Blanchard, no.

MISS BLANCHARD: My Lord, there it is.

MR. JUSTICE LANGLEY: There it is, as you say. Assuming that, Mr. Hacker, you will not succeed in persuading me either that I should bring it back from the 30th November or thereabouts, are you going to be capable, with gritted teeth on both sides, of coming up with a sensible programme to meet that date or should we debate it now

MR. HACKER: It would be disappointing if we could not.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 1480135 (QBD (Adm Ct)), [2001] C.P. Rep. 62

MR. JUSTICE LANGLEY: That is not an answer to my question.

MR. HACKER: My Lord, can I put it in this way? Can we at least have a go rather than taking up your Lordship's time?

MR. JUSTICE LANGLEY: Can I just run through it so that if there are going to be any areas where you are likely to fall out I shall expect each of you to flag them. There is no defence yet; is that right?

MR. HACKER: Can we go back one stage? I would like us to have the opportunity of looking at the way the claim is presently formulated and see whether or not we want to make any amendments.

MR. JUSTICE LANGLEY: That is down to you. How long do you need for that?

MR. HACKER: A week, my Lord. We can do that in a week.

MR. JUSTICE LANGLEY: We will see how we go. Right.

MR. HACKER: If I cannot push you back from November, I will at least have a week for that. And then, my Lord, two weeks for the defence, which would seem to be generous.

MR. JUSTICE LANGLEY: Right.

MR. HACKER: A week for reply.

MR. JUSTICE LANGLEY: Disclosure?

MR. HACKER: My Lord, I do not see why that could not take place within 14 days. I do not know where we are on --

MR. JUSTICE LANGLEY: Somebody behind you is going to have to follow a diary. I never have one.

MR. HACKER: We are talking about something like 28th September for our pleadings, something like shortly before the middle of October, so somewhere towards the end of -- perhaps I am allowing too much time. My Lord, I will advance our pleading to tomorrow. There is no point taking up a lot of time.

MR. JUSTICE LANGLEY: Right, that is good. So you would say 14 days after tomorrow for the defence.

MR. HACKER: Perhaps I was thinking we were further away from 30th November than we are. It is actually two months away. Perhaps we should say 10 days for the defence.

MR. JUSTICE LANGLEY: I am not sure I agree with you. I think 14 days is a sensible suggestion, seven for a reply if any. Disclosure one would expect 14 days after the close of those pleadings, because everybody should be getting on with it now. Miss Blanchard apparently knows that she has got --

MR. JUSTICE LANGLEY: I cannot remember what she said --

MISS BLANCHARD: Seven boxes.

MR. JUSTICE LANGLEY: -- but it was fairly formidable. If you know that much, then there it is. The parties will have to be sensible as to whether these documents are listed or whether they are just listed as -- whatever generic expression. Witness statements.

MR. HACKER: Fourteen days after disclosure?

MR. JUSTICE LANGLEY: There is no real reason to suppose that it is going to be much different from, in your case, the evidence in Bermuda. You did mention one or two people who might be added.

MISS BLANCHARD: My Lord, to some extent it depends on what is in the disclosure. We would say 14 days after disclosure is perhaps a bit optimistic. Obviously, our existing affidavits stand, but we will need to go away and supplement them because they were sworn in the context of the Bermudan proceedings as opposed to the trial. We have not approached them from the prospect of the trial at all. If there is going to be that much documentation realistically --

MR. JUSTICE LANGLEY: I am not sure how much documentation is coming forward from the bank.

MR. HACKER: We have got four files.

MR. JUSTICE LANGLEY: Is there any reason why you should not disclose those within seven days?

MR. HACKER: No.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MR. JUSTICE LANGLEY: In that case, it may be that we will have sequential disclosure, if it is going to take longer on the other side. That will help you, Miss Blanchard, to get your evidence ready.

MISS BLANCHARD: My Lord, it helps me a lot.

MR. HACKER: My Lord, can I just say, as far as the other side's disclosure is concerned, if your Lordship would give two weeks from reply, that takes us to the 4th November, which is starting to get quite late. I do not know whether they will need two weeks at that stage. It will be pretty apparent to the parties before service of the reply what the issues are.

MR. JUSTICE LANGLEY: I think you may have to live with that.

MR. HACKER: Then, my Lord, two weeks for witness statements takes one to 18th November.

MR. JUSTICE LANGLEY: That seems to fit in reasonably well.

MR. HACKER: My Lord, if somebody seriously thinks that this is a case for experts, no doubt in the fullness of time they can explain why and what experts they want, although we still do not think it is.

MR. JUSTICE LANGLEY: It might be more helpful if Miss Blanchard was to give an indication now and one could either make or not make an order to that effect and so we can put a time limit on it. I am treating this as a case management conference at the moment, and the ultimate thing would be that you would be given liberty to apply, obviously.

MISS BLANCHARD: My Lord, if the case for the bank is that termination of the charter means that the defendant will never be able to pay back the loan --

MR. JUSTICE LANGLEY: It seems to meet with a certain amount of dissention.

MISS BLANCHARD: That is the upshot of it, because it is said that the termination of the charter results from material adverse change in the defendant's financial position.

MR. JUSTICE LANGLEY: Come to the point.

What expert evidence do you want?

MISS BLANCHARD: To investigate that, it will be necessary to have forensic evidence of the state of the market and of the realistic prospects for the ships and as to whether the future marketing of them is, as we say, not completely --

MR. JUSTICE LANGLEY: The expert evidence that you are looking for would be evidence -- what -- as to the value of the ships in terms of fixing or sale or whatever?

MISS BLANCHARD: That sort of thing, my Lord, yes, because what is said, and however it is put, is that the termination means that we cannot pay. We do not accept that, because that depends upon what happens in the market and what becomes of the ships. We say we want evidence as to that and also if there is to be a dispute about it broking evidence of the state of the market at the time the loan was entered into, because it is our position that the loan was entered into at very favourable rates and that the parties therefore knew, unless something dramatic happened, that cancellation was perhaps inevitable.

MR. JUSTICE LANGLEY: So what you are really looking for is market evidence of value, putting it in its broadest, both at start and finish, if I can put it in that way.

MISS BLANCHARD: Broadly, my Lord, yes, that is.

MR. HACKER: My Lord, it may be that there is a misconception as to what our case is. Our case is that, as a result of the termination of the charters -- I do not want to get involved in debating the merits, but as a result of the termination of the charters there was an alteration in FISC's position which was material. It is no part of our case to try and establish that the consequence was that they would be unable to repay the loan. That is not our case.

MR. JUSTICE LANGLEY: Can I ask you one other question? Is there any dispute between you that the original fixture with Shell was at very favourable rates?

MR. HACKER: No, there is no issue on our side about that. We will not be inviting the court to look at the company's actual financial position to establish that if you fixed it at this rate, if you fixed it at that rate or if you fixed it at another rate it would not be able to meet its various obligations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

What we will be saying is, effectively and putting it loosely -- I do not want it to be held against me afterwards --

MR. JUSTICE LANGLEY: It will be if you are not careful.

MR. HACKER: That is why I preface what I say in the way that I do. The termination of the charter gave rise to a change in the situation which gave rise to a possibility that it would not be able to repay afterwards, and that was the change that was material because it was adverse.

MR. JUSTICE LANGLEY: I follow what you say. I do not know whether Miss Blanchard is comforted by that.

MISS BLANCHARD: It might be no part of Mr. Hacker's case, my Lord, but certainly from our perspective we will be saying that if he cannot show that it means that we cannot pay, probably cannot pay, then it is not a material adverse change.

MR. JUSTICE LANGLEY: I follow that. Mr. Hacker having said that, would you still wish to call expert evidence?

MISS BLANCHARD: Yes, my Lord, because it will be part of our claim that --

MR. JUSTICE LANGLEY: How long is it going to take you to get that evidence?

MISS BLANCHARD: My Lord, if we were to serve it with the witness statements.

MR. JUSTICE LANGLEY: Mr. Hacker, I am inclined to say it would make sense. You would have the option to call it if you wanted to. I think you are indicating that you think it is all waste of time and you would reserve your position on the costs of any such expert evidence in any event; is that right?

MR. HACKER: My Lord, I would say that, but I do not think, if I may say so, it is entirely satisfactory to have that evidence two weeks before the trial. Obviously, we think it is a waste of time but we would need to see what it said, though. It may be there would be some very simple response to it which would mean it was simpler to respond to it than argue about whether or not it was relevant. One would have to look at the situation as it presented itself.

MR. JUSTICE LANGLEY: There is in fact no reason why you should not get that evidence now; it is all there, is it not? The basic underlying facts are not the problem. So far as what happened at the time of the original fixtures is concerned, it does not seem there is an issue between you in any event, but if he wants to sign off on that, that is fine. I would have thought you would get a tick from the other side, depending on how widely he or she opens the matter.

So far as the current value or whatever you are going to call it of the vessels concerned, again that is a matter of the current market, is it not?

MISS BLANCHARD: My Lord, it is.

MR. JUSTICE LANGLEY: In which case, why do you need so long?

MISS BLANCHARD: My Lord, if we could have until the end of October that would give the claimants ample time.

MR. JUSTICE LANGLEY: I think that is probably right, is it not, Mr. Hacker?

MR. HACKER: My Lord, yes, I do not mind.

MR. JUSTICE LANGLEY: Go for the end of October with you having liberty to apply, but at the same time you have the ability to call a similar expert and you will have to draft appropriate language for what this "bod" is, then you can see where you are.

MISS BLANCHARD: My Lord, since we are all going to be very busy getting ready for this trial, can I invite your Lordship to dispense with the requirement for a case memorandum in this case? I would have thought that it would not help matters much.

MR. JUSTICE LANGLEY: You would not be the first person to say that!

MISS BLANCHARD: If your Lordship is favourable to that, I would invite your Lordship also to dispense with a list of issues because the pleadings ought to adequately explain what the issues are.

MR. JUSTICE LANGLEY: I would be prepared to dispense with both of those, but only on the basis that it would form part of this order that once you have got a date each side will put in a skeleton

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

argument and we can debate it, but I was going to say five days before the day the trial begins.

MISS BLANCHARD: I have no objection.

MR. JUSTICE LANGLEY: Mr. Hacker?

MR. HACKER: No objection, my Lord.

MR. JUSTICE LANGLEY: You can have your dispensations provided that the order records that both sides will do that.

MISS BLANCHARD: My Lord, can I suggest sequential exchange of skeletons. It would be sequential anyway ordinarily for the trial. I do not know why my friend snorts at that. Presumably he has nothing to hide from me. It would be helpful from our perspective if our skeleton was responsive to the claimant's.

MR. HACKER: My Lord, I snort at that because I think that probably means we will get the other side's skeleton the day before the trial.

MISS BLANCHARD: No, I am suggesting five days for mine.

MR. HACKER: Five days before trial?

MISS BLANCHARD: And the claimant's earlier than five days before.

MR. HACKER: That probably means we have to serve ours before we have the other side's witness statements. I think the witness statements up to the 18th November.

MR. JUSTICE LANGLEY: I would be surprised if you got a date of the 1st December. It is going to be not before, to be expedited for hearing not before the 1st December. The 1st December is a Friday, so that if one worked on the basis of giving Miss Blanchard an uncomfortable weekend, if you could serve your skeleton argument on the previous Friday, which is the 30th November --

MR. HACKER: Yes, my Lord.

MR. JUSTICE LANGLEY: Then I would expect her to come forward with hers by 4.00 the following Monday. The skeleton should be under preparation and hopefully will not need much more than tinkering to deal with Mr. Hacker's production.

MR. HACKER: My Lord, could we work on that basis, but if for some reason this does not exactly mesh in with the trial date, the parties could try to be sensible and --

MR. JUSTICE LANGLEY: The sensible thing would also be, if I may say so whilst you are hopefully now, with such guidance as we have had, coming up with an agreed form of order, but it might be at the same time the clerks and so on would go and see the commercial court office on the basis that there is an order for an expedited trial, not before 1st December. See what date you can actually get.

MR. HACKER: My Lord, perhaps we can try and progress all that this afternoon and, on the assumption that your Lordship is chained to his room today and tomorrow --

MR. JUSTICE LANGLEY: The assumption is wrong. I am chained to another case, which is going to take me through to my holiday time, or at least I think it is, but it probably will not be now.

MR. HACKER: My Lord, I think the parties understand your Lordship's difficulties. We will do our very best to agree sensible orders both in relation to the substance of the application and the further directions. If we could have liberty to mention it to your Lordship if there was some difficulty --

MR. JUSTICE LANGLEY: You can have liberty to mention it to me, but whether you will find me here to mention it to is quite another matter. Seriously, I am expecting to be fully occupied on another matter certainly all day and probably as long as the day we had yesterday tomorrow.

MR. HACKER: We will try very hard not to disturb you.

MR. JUSTICE LANGLEY: I will be in this building on Thursday of next week, but not otherwise.

MR. HACKER: My Lord, we are very grateful and we are grateful to the court for making your Lordship available.

MR. JUSTICE LANGLEY: Not at all. Thank you both.

Order: parties to draw up consent order giving

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

effect to judgment. Leave to appeal refused
Anneliese Day, Barrister

(c) Sweet & Maxwell Limited

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 2

*eneral Accident,
*rporation Ltd.,
*Shell Transport*
*23]* 2 K.B. 166.

...s to how the
...l in this case.
What is fair and
...n my judgment
...arties carry on
...ion, both are
...arties who have
...ffered damage,
...one started the
...d get in a claim,
...e. If one gets an
...then the other
...is approach by
...ttention by Mr.
...t under one of
...tration used on
...ir type of order,
...nary order for
...ourts, provides
...of situation to
...the costs of the
...ortunate if an
...orporations in
...heral, the lines
...tions elsewhere

...1 I have not
...this Court not
...' discretion by
...lot have altered
...arker had it not
...it seem to have
...ccisions of this
...s we have had.
...e thought that
...s are likely to
...iterclaim was a
...one but, in my
...to exclude the
...nited extent, in
...mself so as to
...argument was
...claimants with
...arker fixed the
...e claimants at
...is too high. I
...fere with the
...scretion. He is
...he costs of
...am. I would
...imilar amount
...osts of their

...to the extent

**Sir STANLEY REES:** I agree that the appeal should be allowed, and with the reasons stated by my Lord.

Accordingly despite the fact that we are differing from the views expressed by a very experienced Judge in commercial matters I do not propose to add anything.

*[Appeal allowed, with costs here; costs below to be costs in the arbitration. Judge's order varied: respondents to pay £9000 by way of security of costs on the counterclaim, to be paid within 28 days into a joint account in the names of the parties' solicitors unless the parties, by agreement, arrange some other form of guarantee for costs; if so £3000, already paid in by respondents to be paid out to them. Leave to appeal to the House of Lords refused.]*

---

## COURT OF APPEAL

July 5, 6 and 9, 1979

---

## MANTOVANI
v.
## CARAPELLI S.p.A.

Before Lord Justice MEGAW
Lord Justice LAWTON and
Lord Justice BROWNE

**Sale of goods (f.o.b.) — Non-acceptance — Buyers not allowed to use weighing and sampling facilities at port of loading — Whether sellers in breach for failing to provide facilities — Whether buyers justified in rejecting documents — Whether arbitration clause barred all legal proceedings — GAFTA 119.**

The sellers sold to the buyers 20,000 tonnes of U.S.A. soya bean meal, shipment at the rate of 5000 tonnes monthly during January to April, 1975, f.o.b. one Gulf port, New Orleans. The buyers nominated the New York office of a Swiss bank as the place of payment and stated that bills of lading endorsed in blank, a certificate of origin and a phytosanitary certificate would be required, but made no mention of samples.

The contract, which was confirmed by letter dated Aug. 1, 1974, provided inter alia:

Commodity . . . Bill of Lading weight final. Quality and condition final at loading port as per official certificate.

Weight: Final at loading as per weight certificate.

Other conditions and arbitration: According to Contract No. 119 of the Grain and Feed Trade Association.

GAFTA 119 provided inter alia:

13. Weights — Bill of Lading weights to be final. Buyers or their representatives have the right to supervise weighing.

14. Sampling — If required by Buyers, at time and place of shipment by Buyers' and Sellers' representatives in accordance with the appropriate Rules for sampling of the Grain and Feed Trade Association Ltd.

The sellers intended to fulfil the contract from two different sources, under a string contract with ADM as shippers, and under a spot contract between the sellers and ADM as shippers.

The vessel chartered by the buyers arrived at the loading berth on Feb. 27, and the sellers not having heard from the buyers as to their "exact preference/requirements concerning sampling and analysis" arranged for weighing and sampling to be undertaken in accordance with the GAFTA sampling rules.

On the fourth day of loading (Mar. 3), at 10 00 hours two representatives of the buyers called at the offices of the berth and elevator operators saying that they had come for the purpose of supervising the weighing of the parcels and to take samples. The elevator operators got in touch with ADM, upon whose instructions the soya bean meal was being loaded. ADM had never heard of the buyers and therefore refused to grant the facilities unless they were asked to do so by the sellers. The buyers delivered a formal letter of protest to the elevator operators but did not protest to ADM or the sellers' agents.

Loading continued until rain stopped the operations on Mar. 4, when a little short of 4000 tonnes had been loaded. On Mar. 5, the rain stopped and the elevator operators were ready to resume loading but the buyers refused and at 18 25 the vessel left the berth and sailed for another Mississippi port to load other cargo for the buyers. The sellers were informed that the vessel would return to complete loading.

However, the vessel never returned, and on Mar. 11, the sellers gave notice to the buyers holding them in default of the unshipped soya bean meal. The buyers then informed the sellers that weighing and sampling facilities had been refused and that they would only pay for the goods shipped if the documents tendered were strictly in accordance with the contract and if samples for analysis bore the buyers' seal.

The sellers sent an invoice to the buyers' bank, but the buyers refused to take up and pay for the documents, and the dispute was referred to arbitration. Since both the sellers and the buyers were Italian, the sellers sought to obtain security for their claim in the Italian Courts. This caused financial loss to the buyers who sought to recover this loss in the arbitration contending that resort to the Courts otherwise than in the course of and in aid of the arbitration proceedings was a breach of GAFTA arbitration rules, cl. 26(b) of which provided inter alia:

Neither party hereto . . . shall bring any action or other legal proceedings against the other of them in respect of any such dispute until such dispute shall first have been heard and determined by the arbitrators . . . and it is expressly agreed and declared that the obtaining of an award . . . shall be a condition precedent to the rights of either party hereto . . . to bring any action or other legal proceedings against the other of them in respect of any such dispute.

The arbitrators found in favour of the sellers but stated their award in the form of a special case, for the opinion of the Court, the issues being: (1) were the buyers entitled under the terms of the contract to the weighing and sampling facilities which they had requested? (2) if so was the failure of the sellers to provide these facilities a breach of contract such as to justify the buyers in refusing to load any more soya bean meal? (3) were the buyers justified in refusing to pay for the soya bean meal which was in fact shipped?

————*Held,* by Q.B. (Com. Ct.) (DONALDSON, J.), that (1) although the right to supervise weighing

was provided by GAFTA 119, the parties had made their own special bargain with reference to various matters, including weight, quality and condition and intended to look to the GAFTA contract only for other matters and there was therefore no right to supervise weighing;

(2) the buyers had no right to take or supervise the taking of samples since GAFTA 119 only provided that sampling shall be in accordance with the rules "if required by Buyers" and such a request had to be expressed at a reasonable time before shipment and had to be conveyed to the sellers or their agents; and in this case, the buyers request was not expressed before shipment or conveyed to the sellers or their agents but only to the elevator operators who had no direct connection with the sellers;

(3) the buyers had failed to show either that there was a contractual obligation to allow the taking of samples and the supervision of the weighing, the breach of which would determine the contract, or that there was any intention by the sellers to refuse to comply with the terms of the contract;

(4) even if a weight certificate was a shipping document, the buyers were not entitled to treat the sellers' failure to tender it as a breach going to the root of the contract unless the failure was persisted in and amounted to a refusal; the buyers had not asked for a weight certificate and the submission that sealed samples should be tendered with the shipping documents was wholly without foundation and the buyers alone were in breach of contract;

(5) the arbitration clause, 26, prohibited all legal proceedings in respect of a dispute before a final award had been made and the Italian proceedings to obtain security for the claim were proceedings in respect of the dispute even if they were not designed to determine it and the clause did bar all legal proceedings;

(6) the claim for the loss caused by the Italian proceedings was "a dispute arising out of the contract" and the arbitrators had jurisdiction to entertain it; the Courts would stay proceedings which were brought in breach of an agreement to arbitrate and although this would usually result in the aggrieved party suffering no damage, if damage was suffered that party had a clear cause of action in damage and the Board of Appeal of GAFTA were right to award damages to the buyers on their counterclaim.

Award in favour of the sellers upheld.

On appeal by the buyer and cross-appeal by the sellers:

————*Held,* by C.A. (MEGAW, LAWTON and BROWNE, L.JJ.), that A (1) the buyers' appeal would be dismissed as being an appeal which was plainly an abuse of the process of the Court in that the buyers, while inviting the Court to decide whether the learned Judge had arrived at a right conclusion, had issued a writ dated Apr. 6, 1979, asserting that the Courts had no jurisdiction to decide these matters at all (*see* p. 378, col. 1); since the buyers had failed to elect to abandon the attack on the jurisdiction they could not ask the Court to hear the appeal, and from the time when, opportunity having been given, the writ had not

MEGAW, L.J.]   **Mantovani v. Carapelli**   [1980] VOL. 1

the parties had made reference to various tality and condition AFTA contract only is therefore no right

to take or supervise GAFTA 119 only : in accordance with lyers'' and such a t a reasonable time be conveyed to the his case, the buyers efore shipment or agents but only to · had no direct

ow either that there allow the taking of ' the weighing, the ne the contract, or the sellers to refuse contract;

ite was a shipping entitled to treat the breach going to the ailure was persisted the buyers had not nd the submission tendered with the without foundation ch of contract;

prohibited all legal ute before a final talian proceedings 'ere proceedings in were not designed did bar all legal

sed by the Italian rising out of the ad jurisdiction to stay proceedings f an agreement to l usually result in amage, if damage ar cause of action ppeal of GAFTA le buyers on their

pheld.

oss-appeal by the

w, LAWTON and e buyers' appeal ippeal which was the Court in that Court to decide rrived at a right ed Apr. 6, 1979, p jurisdiction to 78, col. 1); since andon the attack ask the Court to he time when, he writ had not

been withdrawn, it became an abuse of the process of this Court to invite this Court to hear an appeal in a matter in respect of which it was being alleged that it did not have jurisdiction (see p. 378, col. 2; p. 379, col. 1); but the sellers were entitled to proceed with their cross-appeal (see p. 379, col. 1);

B as to the sellers' cross-appeal (1) the words of the arbitration clause, 26, were very clear and it was impossible to say otherwise than that cl. 26 did prohibit the taking of proceedings in Italy for security which were taken by the sellers and the learned Judge and the Board of Appeal had come to the right conclusion (see p. 381, col. 2; p. 382, col. 2; p. 383, col. 2); and the sellers were in breach of the clause (see p. 382, col. 1; p. 383, col. 1);

(2) where a party to an arbitration clause did obtain a sequestration order in a foreign Court, that order might cause the other party financial loss and there was no reason in principle why such loss could not be said to flow from the breach of the arbitration clause (see p. 382, col. 1); and the learned Judge came to the right conclusion and the cross-appeal would be dismissed (see p. 382, col. 2; p. 383, col. 1).

---

The following cases were referred to in the judgments:

Doleman & Sons v. Ossett Corporation, [1912] 3 K.B. 257;

Government of Gibraltar v. Kenney, [1956] 2 Q.B. 410;

Heyman and Another v. Darwins Ltd., (H.L.) (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356;

Marazura Navegacion S.A. v. Oceanus Mutual Underwriting Association (Bermuda) Ltd., [1977] 1 Lloyd's Rep. 283.

---

This was an appeal by the buyers, Otello Mantovani and a cross-appeal by the sellers, Carapelli S.p.A., from the decision of Mr. Justice Donaldson ([1978] 2 Lloyd's Rep. 63) upholding the award made by the Board of Appeal of GAFTA in a dispute between the buyers and sellers concerning the weighing and sampling facilities at the port of loading and the action taken by the sellers in the Italian Courts with a view to obtaining security for their claim.

Mr. Colin Ross-Munro, Q.C., and Mr. Michael Gettleson (instructed by Mr. Arturo Barone) for the buyers; Mr. Anthony Hallgarten, Q.C. (instructed by Messrs. Ingledew Brown, Bennison & Garrett) for the sellers.

The further facts are stated in the judgment of Lord Justice Lawton on the cross-appeal.

## JUDGMENT

### (1) On the appeal

**Lord Justice MEGAW:** This is an appeal by Otello Mantovani, the respondents to the appeal being Carapelli S.p.A. They are both, as I understand it, Italian companies, firms or individuals. Disputes arose out of a contract made between the parties, Mantovani as buyers and Carapelli as sellers. In accordance with the express provisions of the relevant contract or contracts, which incorporated a GAFTA form (GAFTA 119), the disputes were referred to arbitration in London under the GAFTA rules. Awards were made by the umpire, in accordance with the procedure. Those awards were referred conjointly, by way of appeal, to the Board of Appeal of GAFTA, in accordance with the arbitration rules. The Board of Appeal made its award on Oct. 24, 1977. It is unnecessary to go into the detail of that award. It was stated in the form of a special case. That was, apparently, by the request of both parties; though whether that was so or not does not, I think, matter. The Board of Appeal awarded that the buyers should pay the sellers the sum of U.S. $1,831,091.80, with interest. That was in respect of the claim made by the sellers against the buyers. On a counterclaim by the buyers against the sellers, the Board of Appeal held that the sellers should pay the buyers the sum of 96,019,078 lire, together with interest thereon at the rate of 10 per cent. per annum.

The special case was brought before Mr. Justice Donaldson in the Commercial Court. He gave judgment on Feb. 15, 1978. In his judgment he upheld the award of the board of arbitrators in both respects: that is, in respect of the award to the sellers against the buyers and, on the counterclaim, the award to the buyers against the sellers (see [1978] 2 Lloyd's Rep. 63).

From that judgment of Mr. Justice Donaldson the buyers gave notice of appeal to this Court by a notice dated Mar. 28, 1978. They invited this Court to hold that the Judge was wrong in making the award in favour of the sellers against the buyers. A notice of cross-appeal and respondents' notice was given by the sellers, dated Apr. 17, 1978, in which they cross-appealed against the decision of Mr. Justice Donaldson upholding that part of the award which directed that the sellers should pay the sum to the buyers.

In all those proceedings so far there had been no suggestion of any defect in the jurisdiction of the arbitral tribunal, or of the Commercial Court of this country, or in respect of the appeal to this Court. Therefore it is obvious that it had been accepted by everybody

Case 1:06-cv-06700-JGK   Document 19   Filed 03/23/07   Page 27 of 53

378

LLOYD'S LAW REPORTS

[C.A.

[1980] VOL. 1]

Mantovani v. Carapelli

[MEGAW, L.J.

concerned, and all the time, expense and costs had been incurred on the basis that this was an arbitration properly brought; that the matter was properly, and with jurisdiction, before the Commercial Court; and that the appeal to this Court was proper, and with jurisdiction.

The appeal came into the Warned List of this Court in January, 1979. It came into the list for hearing today (i.e. July 5, 1979). No indication had been given to this Court or its officers of any difficulty, or objection, or query, or challenge to the jurisdiction of this Court to entertain the appeal, which therefore was listed on the basis of the implied assurance by the solicitors concerned, as officers of this Court, that this matter was properly and with jurisdiction before this Court.

The appeal came to be opened by Counsel on behalf of the appellant buyers. At a very early stage of that opening, Counsel for the respondent sellers rose to inform the Court — and this was the first time that any indication had been given to this Court of any such matter, whether by way of courtesy or otherwise — that a writ had been served within the last few days upon the sellers or their legal representatives by or on behalf of the buyers, the appellants in this appeal. That writ was dated Apr. 6, 1979 — that is, now, nearly three months ago. Despite the fact that the appeal to this Court was pending and in the Warned List, this Court was given no indication whatever of this matter. The endorsement on the writ is this — and it is stated that the writ was issued by a solicitor for a party described in the writ as "the plaintiff"; that is, the appellants in this appeal, the buyers —

The plaintiff's claim is for a declaration that (1) The provision for arbitration contained in an agreement in writing No. [—so-and-so—] between the plaintiff and the defendant dated 1st August 1974 and which said agreement was made in Italy is of no effect; and (2) The plaintiff be at liberty to revoke and make void the appointment and authority of the Umpire who purported to make three arbitration awards all dated 13th April 1976 by virtue of the said agreement.

We are told by Counsel for the appellants that they have received legal advice — I think from an Italian lawyer — the substance of which, as I understood it, was that under the law of Italy, subject to certain exceptions, contracts made between two Italian nationals cannot lawfully provide for jurisdiction for any Court other than an Italian Court; and that that is the basis of the issue of this writ.

I do not propose to comment, because it is something that may have to be determined hereafter by another Court, on the merits or demerits, the chances of success or otherwise, of the litigation which it is sought to put on foot by the issue of that writ. But one thing which is abundantly apparent, and which could not be controverted, as I see it, by anybody, by anything that could be called a process of reasoning, is that it would be a wholly intolerable position that this Court should be invited to determine an appeal from the judgment of the Commercial Court by a party who, at the self-same time, in another Court, a subordinate Court in this country, has started proceedings claiming that the whole of the process in this country, including therefore the judgment of Mr. Justice Donaldson, is devoid of jurisdiction and that therefore this Court would be dealing with, and deciding, if this appeal is proceeded with, questions which are not within the jurisdiction of this Court. If anything can ever properly be described as frivolous, vexatious, and an abuse of the process of the Court, it is that. The solemn and serious suggestion apparently is that this Court should go ahead today, at the invitation of Mr. Otello Mantovani, the buyer, to decide whether or not Mr. Justice Donaldson had arrived at a right conclusion on the construction of the contract and on the rights and wrongs on matters arising out of the contract when, at the self-same time, in proceedings in the Courts in this country, that same person is asserting that the Courts of this country have no jurisdiction to decide those matters at all.

In those circumstances, it appears to me that the only possible course for this Court to take is to give the party who is putting forward at one and the same time in the Courts of this country a case that the Court has jurisdiction and that the Court has not jurisdiction, the opportunity, if he sees fit, to make up his mind whether or not he is contending in the Courts of this country that this Court does not have jurisdiction. If he decides that he is not going to put forward that contention, then he has the opportunity, and he has had the opportunity in this Court, by way of undertaking given through Counsel or otherwise, to put an end to the attack upon the jurisdiction of this Court in the other proceedings. But if he does not choose to exercise that election, this Court should not, as I see it, force him to elect to abandon that which he puts forward in his writ. I express no view whatever as to what is likely to be the fate of the claim asserted in that writ. He may, so far as this Court is concerned, if he sees fit, allow it to stand, for whatever fate may follow properly in accordance with the law of this country and the procedure of this country in connection with that writ. But if he does not elect, because he has now an opportunity of electing, to abandon that attack in that other

success or otherwise, of ought to put on foot by but one thing which is id which could not be it, by anybody, by called a process of would be a wholly this Court should be in appeal from the rcial Court by a party e, in another Court, a s country, has started at the whole of the ncluding therefore the Donaldson, is devoid therefore this Court and deciding, if this , questions which are on of this Court. If erly be described as d an abuse of the that. The solemn and ntly is this that this Court the invitation of Mr. er, to decide whether lson had arrived at a construction of the hts and wrongs on contract when, at the ings in the Courts in rson is asserting that have no jurisdiction ll.

it appears to me that this Court to take is tting forward at one ourts of this country jurisdiction and that on, the opportunity, his mind whether or the Courts of this t does not have iat he is not going to on, then he has the d the opportunity in undertaking given ise, to put an end to tion of this Court in f he does not choose is Court should not, ect to abandon that is writ. I express no likely to be the fate it writ. He may, so ned, if he sees fit, ver fate may follow th the law of this of this country in But if he does not an opportunity of ttack in that other

part of the Supreme Court of this country on the jurisdiction of this Court, then he cannot ask us to hear his appeal or to treat his appeal as being an appeal which is now properly before this Court. From the moment when that writ was issued, and from the time when, opportunity having been given, it is not withdrawn, it becomes an abuse of the process of this Court to invite this Court to hear an appeal in a matter in respect of which it is being alleged that it does not have jurisdiction.

I would therefore, without more ado, the election to abandon not having been made, dismiss the appeal as being an appeal which is now plainly and patently an abuse of the process of this Court. In similar circumstances, I have no doubt whatever that it would be similarly held by a Court in any other jurisdiction in any civilised country in the world which it was sought to treat in the same way.

There remains the cross-appeal. The sellers have cross-appealed against that part of the judgment of Mr. Justice Donaldson which upheld that part of the award of the Board of Appeal which directed that the sellers should pay a sum of money to the buyers. The fact that the buyers, as appellants, have behaved in the way in which they have towards this Court cannot, of course, be used to prejudice the rights of the other party. If the other party, the sellers, choose to proceed before this Court with their cross-appeal, which has been set down in the list to be heard today, I see no reason why they should be deprived of the right to have it heard merely because the other party has acted in the way which I have described. If, in those circumstances, the buyers choose to continue to be represented in respect of the cross-appeal and to make such submissions as they may wish to make, it would be wrong for this Court in any way to preclude them or to hinder them from doing so. What the position would be if the cross-appeal proceeds and if an order is made by this Court on the cross-appeal, and if subsequently, as a result of the writ issued on Apr. 6, 1979, the Courts of this country were ultimately to hold that there was no jurisdiction in the arbitration, or in Mr. Justice Donaldson, or in this Court, is a matter on which I do not propose to speculate. It is a matter which, if it were to arise, can be considered hereafter.

**Lord Justice LAWTON:** I agree.

**Lord Justice BROWNE:** I also agree.

*[The appeal was accordingly dismissed and leave to appeal to House of Lords was refused.]*

(For the order as to costs, see the judgment on the cross-appeal, following.)

Friday, July 6, 1979

## JUDGMENT
### (2) On the cross-appeal

**Lord Justice MEGAW:** I shall ask Lord Justice Lawton to deliver the first judgment.

**Lord Justice LAWTON:** This is an appeal by Carapelli S.p.A., as sellers of goods, from part of the judgment of Mr. Justice Donaldson, given on Feb. 15, 1978 (see [1978] 2 Lloyd's Rep. 63), whereby he adjudged that the third of the three questions of law posed by the Board of Appeal of the Grain and Feed Trade Association in a special case should be answered adversely to the sellers. The third question was in these terms:

Whether the sellers were in breach of the contract in starting legal proceedings in Italy, and if so, whether the buyers are entitled to recover damages in respect thereof.

Mr. Justice Donaldson answered that question in favour of the buyers; and the effect of his so doing was to affirm an award of the Board of Appeal whereby they decided that 96,000,000 lire should be paid by the sellers to the buyers by way of damages.

The matters into which this Court has had to inquire arose in the following circumstances. On Aug. 1, 1974, Carapelli sold to Otello Mantovani 20,000 tonnes of soya bean meal. Both the sellers and the buyers carried on business in Italy. The sellers' business was in Florence, and the buyers' in Verona. The contract provided for delivery by instalments of 5000 tonnes, to be delivered from a Gulf port to be nominated by the sellers, at monthly intervals starting in January, 1975. Almost at once trouble arose about the performance of the contract. As a result, it was claimed by the sellers that the buyers had repudiated the contract in relation to the deliveries for January, February and March.

After setting out various special terms, the contract went on as follows:

All other conditions and arbitration according to the Contract No. 119 of the Grain and Feed Trade Association.

That form of contract has a clause numbered 26, which is in these terms:

(a) Any dispute arising out of or under this contract shall be settled by arbitration in

Case 1:06-cv-06700-JGK   Document 19   Filed 03/23/07   Page 29 of 53

London in accordance with the Arbitration Rules, No. 125, of the Grain and Feed Trade Association Limited, such Rules forming part of this contract and of which both parties hereto shall be deemed to be cognisant.

(b) Neither party hereto, nor any persons claiming under either of them, shall bring any action or other legal proceedings against the other of them in respect of any such dispute until such dispute shall first have been heard and determined by the arbitrators, umpire or Board of Appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly agreed and declared that the obtaining of an award from the arbitrators, umpire or Board of Appeal, as the case may be, shall be a condition precedent to the right of either party hereto or of any person claiming under either of them to bring any action or other legal proceedings against the other of them in respect of any such dispute.

It was pursuant to that arbitration clause that on Apr. 4, 1975, the sellers appointed an arbitrator; and on Apr. 8, 1975, the buyers appointed one. The two arbitrators failed to agree upon their award, and the dispute, which technically was one in respect of each of the instalments due under the contract, was referred to an umpire. On Apr. 13, 1976, he issued three awards, in which he found that the buyers were in default, and accordingly he awarded damages to the sellers. Those awards were the subject-matter of an appeal to this Court by the buyers against part of Mr. Justice Donaldson's judgment. That appeal has already been dismissed, for the reasons set out in the judgment of Lord Justice Megaw, with which I and Lord Justice Browne agreed (see ante p. 377).

It was about the time that the sellers' claims were being considered by the arbitrators and the umpire that an event occurred in Italy which is the basis of the buyers' claim against the sellers and in respect of which the sellers now appeal to this Court. On Apr. 8, 1975, the sellers started legal proceedings in Ravenna in an attempt to obtain security in respect of a claim for damages which had been submitted to arbitration in London pursuant to GAFTA 119. A Court order was obtained from the Italian Court for the detention of some of the buyers' goods in silo. This order was later discharged because the sellers had not provided any bank counter-guarantee as required under Italian procedure.

After the arbitration award had been issued there were further proceedings in Italy. This time the sellers brought proceedings in Verona for the same purpose. They were successful. The buyers' bank accounts were sequestrated.

Later, a quantity of wheat in store was substituted as security. Later still, an attachment order on certain land owned by the buyers was issued instead.

The substance of the buyers' complaint against the sellers is that those proceedings in Italy were in breach of the arbitration clause in the GAFTA form of agreement, and that as a result of the breach they suffered considerable financial loss. Before the Board of Appeal they claimed that they should be compensated for that loss. The Board of Appeal decided in their favour and fixed the damages in the amount to which I have referred. Mr. Justice Donaldson adjudged that the Board of Appeal were right in awarding damages. He answered the question set out in the special case dealing with that topic in the way I have already indicated.

In this Court the sellers have submitted that both the Board of Appeal and Mr. Justice Donaldson were wrong in the decision which they reached. Mr. Hallgarten on their behalf argued that what happened in Italy was not, on the proper construction of the arbitration clause, a breach of that clause; secondly, that in any event in modern law the proper remedy for a breach, if there was one, was not to claim damages but to seek some form of equitable relief, either by way of an application for a stay of proceedings or by way of an injunction.

I turn first to deal with Mr. Hallgarten's submission with regard to the construction of the arbitration clause. He put his argument in this way. He submitted that the object of the arbitration clause was to ensure that the dispute which had arisen between the parties should be dealt with under the arbitration clause and not by any other form of proceeding. The dispute, he said, was one about whether there had been any breach of contract: that was the only dispute with which the arbitration clause was concerned. He went on to say that what had happened in Italy when the sellers had tried to protect themselves against a possible disappearance of the buyers' assets had nothing to do with that dispute. It was an ancillary precaution taken to safeguard the subject-matter of that dispute. In those circumstances it was not a proceeding which was "in respect of" the dispute which was before the arbitrators. He went on to point out that in some circumstances it would have been possible for his clients, the sellers, to have gone to the English Court and got the equivalent of a sequestration order, nowadays known to English lawyers as a *Mareva* injunction, if there had been any assets in England belonging to the buyers. As the buyers had no assets in England, the sellers had gone to a jurisdiction where the buyers had got some assets, which was Italy. All that the sellers

Case 1:06-cv-06700-JGK Document 19 Filed 03/23/07 Page 30 of 53

f wheat in store was rity. Later still, an ertain land owned by the ad.

the buyers' complaint at those proceedings in the arbitration clause in greement, and that as a ey suffered considerable he Board of Appeal they ld be compensated for Appeal decided in their mages in the amount to Mr. Justice Donaldson l of Appeal were right in answered the question e dealing with that topic indicated.

ers have submitted that ppeal and Mr. Justice in the decision which garten on their behalf ed in Italy was not, on n of the arbitration lause; secondly, that in the proper remedy for one, was not to claim me form of equitable n application for a stay of an injunction.

with Mr. Hallgarten's to the construction of e put his argument in that the object of the ensure that the dispute the parties should be tration clause and not oceeding. The dispute, hether there had been that was the only rbitration clause was to say that what had he sellers had tried to gainst a possible rs' assets had nothing

It was an ancillary feguard the subject-those circumstances it h was "in respect of" re the arbitrators. He n some circumstances le for his clients, the le English Court and sequestration order, glish lawyers as a e had been any assets the buyers. As the gland, the sellers had e the buyers had got ly. All that the sellers

were doing in Italy was what they would have been entitled to do in England had the buyers had assets within the jurisdiction of this Court. He relied upon that situation as showing that what the sellers were doing had nothing to do with the dispute with which the arbitrators were concerned and was not a breach of the arbitration clause.

That argument has its attractions. In some circumstances and some arbitration clauses it may be necessary, in order to do justice, to allow that kind of proceeding. In *Marazura Navegacion S.A. v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.,* [1977] 1 Lloyd's Rep. 283, Mr. Justice Robert Goff was tentatively attracted by some such argument. It is necessary, however, to point out first that the arbitration clause in that case was in a different form from that which is in GAFTA 119; and secondly, that Mr. Justice Robert Goff was delivering a judgment on an application for an interlocutory injunction to restrain proceedings in a foreign Court: he was not making a final determination.

This Court is concerned with an arbitration clause of a particular type. Every word of that clause has to be looked at in order to find out what was the intention of the parties. The first part of the clause is the part giving jurisdiction to the arbitrators. As Mr. Ross-Munro pointed out in the course of his reply to Mr. Hallgarten's submission, it is in very wide terms indeed. The opening words show that there is no limitation in the clause of the kind of dispute which is to be referred to arbitration. It is *"Any* dispute"; and it is "Any dispute arising out of or under this contract". The words "arising out of or under this contract" are words which often appear in arbitration clauses. They are words which have had to be construed many times by the Courts; and the Courts have always adjudged that they are very wide words indeed: see the judgment of Mr. Justice Sellers (as he then was) in *Government of Gibraltar v. Kenney,* [1956] 2 Q.B. 410, at p. 421. It follows, therefore, that the arbitrators in this case were given a jurisdiction in about as wide terms as can be drafted.

The second part of the clause contains a specific prohibition of certain kinds of action against those who are submitting to arbitration, and ends with the making of an award a condition precedent to any cause of action which may arise under the contract itself.

It is now necessary to see what are the specific prohibitions upon the parties to the arbitration agreement:

Neither party hereto, nor any persons claiming under either of them, shall bring any action or other legal proceedings against the

other of them in respect of any such dispute until such dispute shall first have been heard . . .

It is necessary to look particularly at some of these words. The prohibition is against bringing "any action of other legal proceedings". The words "other legal proceedings" are wide enough to cover proceedings in Italy for the form of order which in England would be called a *Mareva* injunction. Clearly such proceedings were for relief in respect of the dispute. The object was to freeze the buyers' assets pending the making of an award. What happened in Italy was the bringing of "other legal proceedings". Mr. Hallgarten went on to say that, even if that were so (and he did not accept that it was so), they were not proceedings "in respect of any such dispute" as was defined in the first part of the arbitration clause. But, as I have already commented, the first part of the arbitration clause is in very wide terms indeed. It follows, therefore, that the "other legal proceedings" were "in respect of" the wide form of jurisdiction with which the arbitration clause was concerned. For my part, I would construe the words as meaning that any form of application for ancillary relief, and in particular that sought in Italy, was within the arbitration clause.

I was attracted at one stage of Mr. Hallgarten's submissions, as I have already said, by the fact that in some cases it may be just that those concerned in an arbitration should be allowed to go outside the jurisdiction to seek ancillary relief. But that has got to be balanced, as Mr. Ross-Munro submitted, against the possibility that proceedings outside the jurisdiction may be oppressive to one of the parties to an arbitration. He pointed out, for example, that the consequence of getting a sequestration order against the banking accounts of one of the parties to an arbitration may have the effect of making it difficult for that party to take part in the arbitration.

These are the sort of considerations which have to be balanced one against the other. For my part, I can see no reason at all for making any exception, under what I consider to be the plain meaning of the words, in favour of the kind of sequestration proceedings which were taken by the sellers in the Italian Courts. It follows, therefore, that there was a breach by them of the terms of the arbitration clause.

The next point taken by Mr. Hallgarten on behalf of the sellers was that, even though there was a breach of the arbitration clause, nevertheless an application for damages in the arbitration was an inappropriate form of relief, and that under modern conditions the buyers should have proceeded in a different way. He

LLOYD'S LAW REPORTS [C.A.

Mantovani v. Carapelli [BROWNE, L.J.

sought for that purpose to rely upon a comment made by Lord Macmillan in *Heyman v. Darwins Ltd.,* (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356, at pp. 75 and 374. In the course of his speech in that case Lord Macmillan said:

> The appropriate remedy for breach of the agreement to arbitrate is not damages but its enforcement.

On that sentence Mr. Hallgarten has built his argument. But, as Lord Justice Megaw pointed out in the course of the argument, the question which had to be decided by the House of Lords in *Heyman v. Darwins Ltd.* was a very different one indeed from what has to be decided in this appeal. What Lord Macmillan was referring to in that sentence was damages in an action under the contract, and not to the question as to whether arbitrators in an arbitration could award damages for breach of the arbitration clause. It seems to me obvious that, where a party to an arbitration clause does obtain a sequestration order in a foreign Court, that sequestration order may cause the other party financial loss, perhaps in a substantial amount. I can see no reason in principle why such loss cannot be said to flow from the breach of the arbitration clause.

Mr. Hallgarten pointed out, and with force, that the reports do not seem to contain any reference to a similar kind of case; and as far as I know (and his researches are always thorough) that is almost certainly true. But the explanation is fairly simple. In the ordinary way, those who try to obtain ancillary relief through the Courts will do so in England, and if they do so in England then no question of damage can arise because under the terms of most arbitration clauses, and certainly under the terms of clauses providing for arbitration within the jurisdiction of the Supreme Court of Judicature, the Arbitration Act, 1950, applies. In those circumstances, what the parties do if they seek ancillary relief within the jurisdiction of this Court is something which the arbitration clause and the Arbitration Act permits. In other cases it may be convenient for the parties, and probably would be, to restrain what was being done in foreign Courts by means of an injunction. That was what was sought to be done in the case which was before Mr. Justice Robert Goff, to which I have already referred. It must be an unusual case where the kind of situation which has arisen in this case has to be considered by the Court. Anyway, the fact that a claim is novel does not necessarily mean that it is bad. It may give the Court grounds for examining it closely before it decides that there is a good claim.

I have done my best to look closely at Mr. Hallgarten's submission with regard to

damages, and for my part I can see nothing wrong in principle with what happened in this case. Damage was proved to the satisfaction of the Board of Appeal. They have made their awards and, as Mr. Justice Donaldson accepted, it was a matter with which the Board of Appeal were entitled to deal. In those circumstances, it seems to me that Mr. Hallgarten's submissions with regard to damages must be rejected. It follows that I would dismiss his cross-appeal.

**Lord Justice BROWNE:** I agree that the cross-appeal should be dismissed. I am almost content to say merely that I agree, because I agree so entirely with the reasons given by my Lord, and also those given by Mr. Justice Donaldson; but I think it right to add a few words of my own.

Mr. Hallgarten, in opening the cross-appeal, took three points. He said that the first question was: as a matter of construction, does cl. 26 operate as a bar to any legal proceedings at all, or only to such legal proceedings as go to the substance or merits of the dispute? He said that the second question was: if there was a breach of the arbitration clause, did the arbitrators have power to award damages? Thirdly, whether damages, in modern law, were the relevant remedy in relation to a breach of this kind of clause? Today, he said that he does not pursue his argument on the second question.

So far as the first question is concerned, the construction, I am bound to say that I can see practical arguments in favour of the result which would be produced by Mr. Hallgarten's construction. If the buyers have assets in England, the sellers would be entitled to apply to the High Court, under s. 12(6) (f) of the Arbitration Act, 1950, for provision for securing the amount in dispute. Where a party has no assets in England, I can see the argument that the party ought to be able to proceed in the country where the assets are for the purpose of securing the amount in dispute. I can see also, of course, the arguments on the other side which Mr. Ross-Munro put forward, on the point of inconvenience. Those arguments, it seems to me, would in many cases apply with equal force to an application for security in England. I think that Mr. Justice Robert Goff, in the case to which my Lord has referred, was attracted by the idea that this course of procedure might be desirable. But I think that in the end the words of cl. 26 of this particular contract are too clear. For the reasons which have already been given and which I need not repeat, it seems to me quite impossible to say otherwise than that cl. 26 does prohibit the taking of the proceedings in Italy for security which were taken by the sellers in this case.

part I can see nothing
h what happened in this
ved to the satisfaction of
They have made their
Ir. Justice Donaldson
er with which the Board
tled to deal. In those
ms to me that Mr.
ions with regard to
cted. It follows that I
-appeal.

VNE: I agree that he
dismissed. I am almost
that I agree, because I
he reasons given by my
given by Mr. Justice
k it right to add a few

pening the cross-appeal,
id that the first question
onstruction, does cl. 26
legal proceedings at all,
roceedings as go to the
he dispute? He said that
s: if there was a breach
se, did the arbitrators
d damages? Thirdly,
modern law, were the
ion to a breach of this
he said that he does not
he second question.

stion is concerned, the
ed to say that I can see
favour of the result
ed by Mr. Hallgarten's
uyers have assets in
ild be entitled to apply
der s. 12(6) (f) of the
, for provision for
dispute. Where a party
I can see the argument
e able to proceed in the
are for the purpose of
dispute. I can see also,
its on the other side
put forward, on the
Those arguments, it
nany cases apply with
cation for security in
. Justice Robert Goff,
Lord has referred, was
that this course of
ble. But I think that in
26 of this particular
or the reasons which
and which I need not
uite impossible to say
26 does prohibit the
s in Italy for security
e sellers in this case.

Accordingly, in my view, the Board of Appeal and Mr. Justice Donaldson came to a right conclusion about that.

So far as the third point is concerned, the Judge was referred to, and did himself refer to, the judgment of Lord Justice Fletcher-Moulton in *Doleman & Sons v. Ossett Corporation,* [1912] 3 K.B. 257. At p. 267, Lord Justice Fletcher-Moulton reviewed the history of the remedies which one party to an arbitration agreement would have in the Courts in the case of a breach of an arbitration clause. He explained that before the Common Law Procedure Acts the other party had no remedy except to bring an action for damages for breach of contract; but in the Common Law Procedure Acts, and afterwards in the Arbitration Act, 1889, and subsequent Acts, the Courts were given the power to stay actions brought in breach of an arbitration clause. As I understand it, Mr. Hallgarten has really got to say that as a result of those statutory provisions giving the power to stay, the right to bring actions for damages for breach of an arbitration clause has been barred. It seems to me plain that Lord Justice Fletcher-Moulton did not mean that, because he said, at p. 271—

I am therefore of opinion that, so soon as an action is brought in respect of a difference to which an arbitration clause applies, there is a complete breach of that clause so far as that particular dispute is concerned, and that the only right which arises directly therefrom is a claim for damages for breach of contract. The defendant may, however, apply to stay the action under the provisions of s. 4 of the Arbitration Act, 1889, but if he neglects so to do, or if the Court refuses to stay the action, the Court has the sole and exclusive jurisdiction to decide the dispute.

As I understand it, Lord Justice Fletcher-Moulton was saying there that the right to bring an action for damages for breach of an arbitration clause still exists, in spite of the introduction of the procedure enabling the other party to apply for a stay. It is quite true that there is, so far as we have been shown, no reported case in which damages have been awarded for breach of such a clause. It is said that what was said by Lord Justice Fletcher-Moulton was obiter. But, as Lord Justice Lawton has pointed out, the explanation for the absence of authority is obvious. There is no need for me, I think, to repeat what he has already said about that. It seems to me that in principle there must be a right to bring an action for damages in respect of breach of such a clause.

In my judgment, as I have said, Mr. Justice Donaldson came to the right conclusion on both

these points; and accordingly I agree that the cross-appeal should be dismissed.

**Lord Justice MEGAW:** I also agree.

This appeal was a cross-appeal by the sellers, Carapelli S.p.A., of Florence, to an appeal by the buyers, Otello Mantovani, of Verona. I say "was" a cross-appeal because yesterday, for reasons which we then gave, we dismissed the appeal by Mantovani, since they, the appellants in that appeal, were inviting us to deal with an appeal against a judgment affirming an award, both of which judgment and award those self-same appellants were contending in the High Court, and, as appeared, were proposing before us to continue to contend, were nullities. We have now to deal with the cross-appeal, since the cross-appellants, the sellers, Messrs. Carapelli, do not challenge the validity of the judgment, nor accept the challenge that has been made to it by the buyers. It would plainly be inconsistent with the requirements of justice if we were to prevent the sellers from presenting their cross-appeal merely because the buyers have taken the attitude which they have seen fit to take at a late stage in respect of the supposed non-validity of the award which they took part in procuring and of the judgment which they contested without challenge to its validity. We have had, I am glad to say, the assistance of Counsel for the buyers in relation to the cross-appeal, no doubt on instructions. So that the buyers, therefore, in this Court are recognising the validity of the award and the judgment, at any rate to the extent, so far as they are permitted to limit it at all, that they are seeking to uphold it in so far as it is in their favour.

So far as the first question is concerned, I fear that I may be regarded as being unduly simple in expression if I say that I can see no answer whatever to the short and entirely clear way in which Mr. Justice Donaldson expressed his conclusions. He said that Mr. Hallgarten, for the sellers, had said—

. . . that the arbitration clause does not bar all legal proceedings but only those designed to settle the original dispute between the parties, that is, whether the sellers or the buyers repudiated the contract, and that the Italian proceedings were not of that nature.

In this Court, Mr. Hallgarten put it, I think, in what was essentially the same way, though not in identical words. The question as he put it to us yesterday was: as a matter of construction, does cl. 26 operate as a bar to any legal proceedings whatever or merely those which go to substance? Mr. Justice Donaldson said, in relation to that argument—

I do not accept this submission. The clause prohibits all legal proceedings in

respect of the dispute before a final award has been obtained and the Italian proceedings to obtain security for the claim are proceedings in respect of the dispute even if they are not designed to determine it.

I respectfully agree.

Then in relation to the same argument, put in a slightly different way, or perhaps a slightly more limited way, Mr. Justice Donaldson said this (at p. 73 of [1978] 2 Lloyd's Rep.):

Second, he [—that is, Mr. Hallgarten—] says that the claim for loss caused by the Italian proceedings is not a "dispute arising out of or under this contract" and accordingly the arbitrators had no jurisdiction to entertain it. This, in my judgment, is plainly wrong. Whether the terms of the contract leave the sellers free to seek security for their claim from the Italian courts and whether, if they do not, the buyers are entitled to any, and if so how much, damages is indeed a "dispute arising out of the contract".

I agree.

As to the final point taken by Mr. Hallgarten, he said that, even if he is otherwise wrong, damages is not in modern law a relevant remedy in respect of a breach of the nature alleged. In support of that proposition, as Lord Justice Lawton had mentioned, Mr. Hallgarten relied upon a sentence in a passage in Lord Macmillan's speech in *Heyman v. Darwins Ltd.,* (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356, at pp. 75 and 374. I quote the sentence again:

The appropriate remedy for breach of the agreement to arbitrate is not damages but its enforcement.

With all due respect to Mr. Hallgarten's argument, he takes the sentence wholly out of its context, it does not bear. What the House of Lords were dealing with in *Heyman v. Darwins Ltd.* was the question whether, where there has been a fundamental breach of the contract accepted by the other party as a repudiation, an arbitration clause included in that contract remains alive. It had been suggested that because the contract was put an end to the arbitration clause also was put an end to. It was in that context that Lord Macmillan spoke the words which he did. What he was saying was that although the parties, by the acceptance of a fundamental breach, were both free from the obligation to perform the remaining terms of the contract, in relation to an arbitration clause it did not die with the contract. It remained alive: so that, although there was no duty to perform any other, future, obligations under the contract, there remained the obligation of

the arbitration clause. As the arbitration clause remained alive, there was no question of damages for breach of it. The proper course was to make use of it. If either party refused to arbitrate when the other party wished to do so, then that other party did not claim or recover damages. He simply proceeded with the arbitration, as he remained entitled and able to do. That is of no relevance to the present case.

I can see no basis for the suggestion that in an appropriate case, where damages can be proved to have followed from a breach of contract of the nature with which we are here concerned, damages should not be recoverable. That does not, of course, mean that, if there is an arbitration clause in the contract and one party in disregard of it starts an action in the Courts of this country, therefore he will become liable for damages to the other party for having so done. The reason why he is not liable for damages in those circumstances is because the remedy lies in the other party's own hands under s. 4 of the Arbitration Act, which is necessarily incorporated in the arbitration agreement itself. The other party can apply to the Court to have the matter referred to arbitration, and under the provisions of the Arbitration Act the Court can so order. If it does so, there are no damages other than the costs of the application, which will be dealt with by the Court in the ordinary way. If the Court decides not to order the reference to arbitration, it is because the Court thinks that arbitration is not proper in the particular case; and the agreement for arbitration itself incorporating the Arbitration Act necessarily by inference includes, as a contractual provision, that if the Court holds that arbitration is not suitable there is no breach of the agreement in the party not arbitrating.

The same does not apply in the present case to the suggestion which has been made that the sellers might say that the buyers had failed to do what they ought to have done by applying to the High Court in this country for an injunction to prevent the sellers from proceeding with their Italian proceedings. That might conceivably, if foundation had been laid for it, have provided good ground for saying that the buyers had failed to take proper steps to mitigate the loss which they would suffer as the result of the breach of contract which was about to be or was in process of being committed. Whether or not that would have provided a valid answer, it has not been raised in this case and it would not be appropriate to raise it now.

I agree that the cross-appeal falls to be dismissed.

he arbitration clause
as no question of
he proper course was
ıer party refused to
ırty wished to do so,
ıot claim or recover
·oceeded with the
entitled and able to
o the present case.

suggestion that in an
nages can be proved
reach of contract of
are here concerned,
overable. That does
at, if there is an
ıtract and one party
action in the Courts
e will become liable
ɔarty for having so
ɜ is not liable for
ınces is because the
party's own hands
tion Act, which is
in the arbitration
party can apply to
matter referred to
: provisions of the
can so order. If it
ıges other than the
ch will be dealt with
y way. If the Court
·ence to arbitration,
.s that arbitration is
ılar case; and the
itself incorporating
ɜarily by inference
·ovision, that if the
is not suitable there
ɜnt in the party not

n the present case to
ɔeen made that the
/ers had failed to do
e by applying to the
for an injunction to
oceeding with their
ight conceivably, if
ɔr it, have provided
ıat the buyers had
to mitigate the loss
s the result of the
ɜ about to be or was
ed. Whether or not
valid answer, it has
ınd it would not be

.ppeal falls to be

Monday, July 9, 1979

[The Court moves the following order after discussion with Counsel for both parties:

*Appeal dismissed. Cross-appeal dismissed. Order of Court below affirmed. Buyers to pay two-thirds of the sellers' costs of the appeal and cross-appeal. Liberty to either party to apply to the Commercial Court.*]

---

## COURT OF APPEAL

May 3 and 4, 1979

---

TOEPFER
v.
SCHWARZE

Before Lord DENNING, M.R.,
Lord Justice WALLER
and Lord Justice CUMMING-BRUCE

**Sale of goods (c.i.f.) — Prohibition — Non-delivery — Sale of U.S. soya bean meal c.i.f. Weser — Embargo on export imposed by U.S. Government — Whether sellers excused by terms of contract for failure to deliver — GAFTA 100.**

By a contract dated Dec. 6, 1972, the sellers agreed to sell to the buyers 9000 tonnes of U.S. soya bean meal c.i.f. Weser, 1500 tonnes to be shipped in each of the months of April, May, June, July, August and September, 1973. The contract incorporated GAFTA 100, the material clauses of which provided (inter alia):

> 9. The contract period of shipment, if such be 31 days or less, shall if desired by the Shipper, be extended by an additional period not exceeding 8 consecutive days, provided that the Shipper gives notice claiming extension by telegram telex or teleprinter sent not later than the next business day following the last day of the originally stipulated period . . .
>
> 21. In case of prohibition of export . . . by . . . the Government of the country of origin . . . . where the port or ports of shipment . . . is/are situate, preventing fulfilment, this Contract or any unfulfilled portion thereof so affected shall be cancelled. In the event of shipment proving impossible during the contract period by reason of any of the causes enumerated herein Sellers shall advise buyers without delay with the reasons therefor. If required Sellers must produce proof to justify their claim for cancellation.

On Jan. 23, 1973, the sellers chartered the vessel *Belval* to load at one or two safe berths a minimum of 18,500 long tons of inter alia soya beans from U.S. Gulf to Weser. The vessel was estimated to tender for loading during the last week in June although in the event notice of readiness was tendered at 08 30 hours on June 30, 1970, the last day for the period of shipment provided for by the contract.

As a result of a series of export control bulletins issued by the United States Department of Commerce restricting the amount of soya bean meal that could be exported to 40 per cent., the seller was unable to ship the June instalment but gave no notice of this fact to the buyer until July 10, 1973, and did not claim an extension under cl. 9.

By telex dated Aug. 6, 1973, the sellers tendered

# Exhibit 3

QUEEN'S BENCH DIVISION
(COMMERCIAL COURT)

Mar. 12, 1999

IN RE Q's ESTATE

Before Mr. Justice RIX

**Practice - Mareva injunction - Jurisdiction - Arbitration clause - Daughter entered into retainer agreement with lawyers in relation to claim to share in father's estate - Retainer agreement contained arbitration clause - Claim successful - Lawyers obtained Mareva injunction - Whether Court had jurisdiction to grant injunction because parties had agreed all disputes to be within exclusive jurisdiction of arbitration tribunal - Arbitration Act, 1996, s. 44.**

The daughter of a wealthy man, Q, having been left out of his will, sought to challenge the dispositions of his estate by bringing proceedings against other members of her family in the foreign country where she lived. She entered into a retainer with a leading firm of lawyers in that country under which they would act for her in relation to her claim to share in the estate, on the basis of a contingency fee. The retainer agreement contained an English law and London arbitration clause in the following terms:

This Agreement shall be governed by and construed in accordance with the provisions of English Law any disputes deriving [from] or in connection with this agreement will be submitted to the exclusive jurisdiction of arbitration in London under the London Arbitration Act as amended. . .The award of the arbitral tribunal shall be final, immediately enforceable and not subject to appeal.

The daughter's legal challenge to her father's will was successful in that the beneficiaries agreed to settle her claim for a very large sum of money. The completion took place in London on Oct. 7, 1998 and the cash was paid into an account in Jersey.

The lawyers were fearful that they would not be paid their fee, which under the retainer was to be 5 per cent. of the daughter's recovery. The fee itself amounted to a substantial sum and they sought to protect their claim by bringing proceedings in England inter alia for a Mareva injunction over the proceeds of the settlement. On Oct. 7, 1998 an injunction was granted on the lawyers' ex parte application.

The daughter applied to discharge the Mareva injunction and to stay the proceedings for arbitration.

The daughter submitted that the Court had no jurisdiction to grant ancillary relief in respect of the lawyers' claim because the arbitration tribunal to be appointed under the retainer agreement's arbitration clause was to have "exclusive jurisdiction" over "any dispute deriving [from] or in connection with" that agreement. The daughter relied on s. 44 of the Arbitration Act, 1996 which provided inter alia:

(1) Unless otherwise agreed by the parties, the court has for the purposes of and in relation to arbitral proceedings the same power of making

orders about the matters listed below as it has for the purposes of and in relation to legal proceedings.

(2) Those matters are -. . .(e) the granting of an interim injunction . . .

(3) If the case is one of urgency, the court may, on the application of a party or proposed party to the arbitral proceedings, make such orders as it thinks necessary for the purpose of preserving evidence or assets.

The daughter submitted that the parties had "otherwise agreed" because "any dispute deriving [from] or in connection with" the retainer agreement embraced a dispute as to the granting of the Mareva injunction sought by the lawyers.

The lawyers submitted that a distinction had to be made between disputes "on the merits" and disputes relating to ancillary matters such as were listed in s. 44. "Any dispute" in the parties' clause was to be construed as relating only to disputes on the merits, and if it were otherwise then every arbitration clause would have to be construed as excluding the Court's powers in such ancillary matters, which would be remarkable and unsatisfactory.

*-Held*, by Q.B. (Com. Ct.) (RIX, J.), that (1) the injunction would be discharged (*see* p. 932, col. 2);

(2) arbitration was in any event an exclusive jurisdiction; the word "exclusive" was merely intended to underline the general rule, which was that substantive proceedings must be by way of arbitration, rather than to introduce the exceptional situation where the parties were barred from ancillary proceedings in Court; the emphasis made good sense in the light of the exclusion of any right of appeal; and if the parties wanted to exclude the right to resort to the Court under s. 44 for assistance in ancillary matters they could and should have done so by more specific wording (*see* p. 938, col. 1);

*-Mantovani v. Carapelli S.p.A.*, [1978] 2 Lloyd's Rep. 63, considered.

(3) the Court did not lack jurisdiction to make the Mareva order that it was asked to make by reasons of the terms of the arbitration clause; the Mareva order was discharged on the merits and not on the grounds of any lack of jurisdiction (*see* p. 938, cols. 1 and 2);

(4) a Mareva injunction cannot be granted before a cause of action has arisen, but in anticipation of the imminent arising of a cause of action the Court can be approached to apprise it of the request for an injunction that will be made once the cause of action has arisen and to ask the Court to indicate whether it would in principle be willing to grant an injunction at such time; but the Court will be astute to ensure that such a procedure was used properly and without abuse (*see* p. 938, col. 2; p. 939, col. 1);

*-The Veracruz I*, [1992] 1 Lloyd's Rep. 353, distinguished.

The following cases were referred to in the judgment:

*A v. B*, [1989] 2 Lloyd's Rep. 423;
*Angelic Grace, The* [1995] 1 Lloyd's Rep. 87;

[1999] Vol. 1           LLOYD'S LAW REPORTS          932
Q.B. (Com. Ct.)               Re Q's Estate          RIX, J.

Bouygues Offshore S.A. v. Caspian Shipping Co. (Nos. 1, 3, 4 and 5), (C.A.) [1998] 2 Lloyd's Rep. 461;

Mantovani v. Carapelli S.p.A, (C.A.) [1980] 1 Lloyd's Rep. 375; [1978] 2 Lloyd's Rep. 63;

Petromin S.A. v. Secnav Marine Ltd., [1995] 1 Lloyd's Rep. 603;

*Rena K*, The [1978] 1 Lloyd's Rep. 545;

Rowland v. Gulfpac (sub nom. Inoco Plc. v. Gulf USA Corporation), (C.A.) Jan. 24, 1997, unreported; July 24, 1995 unreported;

Scott v. Avery, (H.L.) (1856) 5 H.L.C. 811;

*Siskina*, The (H.L.) [1978] 1 Lloyd's Rep. 1; [1979] A.C. 210;

Toepfer International G.m.b.H. v. Société Cargill France, [1998] 1 Lloyd's Rep. 379;

Ultisol Transport Contractors Ltd. v. Bouygues Offshore S.A. (No. 1), [1996] 2 Lloyd's Rep. 140;

*Veracruz I*, The (C.A.) [1992] 1 Lloyd's Rep. 353;

Zucker v. Tyndall Holdings Plc., [1992] 1 W.L.R. 1127.

This was an issue as to whether the Court lacked all jurisdiction to grant a *Mareva* injunction because the parties had agreed that all disputes deriving from their agreement, including a dispute relating to ancillary remedy should be within the exclusive jurisdiction of the arbitration tribunal.

Mr. Nicholas Hamblen, Q.C. (instructed by Messrs. Ince & Co.) for the plaintiff; Mr. T. Beazley (instructed by Messrs. Peters & Peters) for the defendants.

The further facts are stated in the judgment of Mr. Justice Rix which was given in Chambers but has been released for publication.

## JUDGMENT

**Mr. Justice RIX:**

The daughter of a wealthy man, Q, having been left out of his will, sought to challenge the dispositions of his estate by bringing proceedings against other members of her family in the foreign country where she lived. She entered into a retainer with a leading firm of lawyers in that country, under which they would act for her, in relation to her claim to a share in the estate, on the basis of a contingency fee. Her legal challenge to her father's will was successful, in that the beneficiaries agreed to settle her claim for a very large sum of money. The completion took place in London, at about 16 00 hours on Oct. 7, 1998, and the cash was paid into an account in Jersey.

The lawyers were fearful that they would not be paid their fee, which under the retainer was to be 5 per cent. of the daughter's recovery. The fee itself amounted to a substantial sum. They therefore sought to protect their claim by bringing proceedings in England, inter alia for a *Mareva* injunction over the proceeds of the settlement. On Oct. 7, 1998, at 16 25 hours, I granted such an injunction on the lawyers ex parte application. On Oct. 8 I granted leave to bring similar proceedings in Jersey.

The writ, which claimed the fee under the retainer agreement, was served together with the order for a *Mareva* injunction at the daughter's hotel in London on the evening of Oct. 7. There was at one time a dispute about whether proper service was effected, but I have not heard any argument about that.

The retainer agreement, which primarily contemplated proceedings in the foreign country but also "out of Court" proceedings in other countries as necessary, contained an English law and London arbitration clause in the following terms:

This Agreement shall be governed by and construed in accordance with the provisions of English Law any disputes deriving [from] or in connection with this agreement will be submitted to the exclusive jurisdiction of arbitration in London under the London Arbitration Act as amended. . .The award of the arbitral tribunal shall be final, immediately enforceable and not subject to appeal.

On Oct. 29 and Nov. 3, 1998 I heard the daughter's application, inter partes, to discharge the *Mareva* injunction and to stay the proceedings for arbitration. It was common ground that the merits of the lawyers' claim for their fee should be stayed for arbitration, but the question of the ancillary order for a *Mareva* was the subject of much controversy. I heard in this connection two primary arguments. The first was that the Court lacked all jurisdiction to grant a *Mareva* injunction because the parties had agreed that all disputes deriving from their agreement, including a dispute relating to such an ancillary remedy, should be within the exclusive jurisdiction of the arbitral tribunal. The second was that in any event the lawyers failed to show a real risk that the daughter would not pay any award against her.

At the close of the hearing, I gave an ex tempore judgment in favour of the daughter on the second ground, discharged the injunction and stayed all proceedings for arbitration. I did not require, but I was offered, an undertaking on behalf of the daughter that she would meet any award made against her, and that undertaking is recorded in my order. However, I reserved judgment on the question of

[1999] Vol. 1          LLOYD'S LAW REPORTS                    933
Q.B. (Com. Ct.)            Re Q's Estate                    RIX, J.

my jurisdiction, for it raised an interesting point of general importance under the new Arbitration Act, 1996.

It is that question that I deal with in this judgment. I shall also refer below to another question of jurisdiction concerning the power of the Court to grant a *Mareva* injunction at a time when a breach of contract is feared but a cause of action has not yet arisen: cf. *The Veracruz I*, [1992] 1 Lloyd's Rep. 353.

### Section 44 of the Arbitration Act, 1996 - "Unless otherwise agreed"

Mr. Beazley, on behalf of the daughter, submitted that the Court had no jurisdiction to grant ancillary relief in respect of the lawyers' claim because the arbitral tribunal to be appointed under the retainer agreement's arbitration clause was to have "exclusive jurisdiction" over "any dispute deriving [from] or in connection with" that agreement. In this connection he relied on the opening words, "Unless otherwise agreed. . .", of s. 44 of the Arbitration Act, 1996 (the "1996 Act"). That section confirms that the Court has the same power of making orders in relation to arbitral proceedings about inter alia the preservation of evidence and (of particular importance for present purposes) the granting of an interim injunction as it has in relation to legal proceedings - "Unless otherwise agreed by the parties". The submission was that the parties here had "otherwise agreed" because "any dispute deriving [from] or in connection with" the retainer agreement embraced a dispute as to the granting of the *Mareva* injunction sought by the lawyers. In this connection Mr. Beazley relied on *Mantovani v. Carapelli S.p.A.*, [1978] 2 Lloyd's Rep. 63 (Mr. Justice Donaldson); [1980] 1 Lloyd's Rep. 375 (C.A.).

On behalf of the lawyers, Mr. Hamblen, Q.C., submitted on the other hand that a distinction has to be made between disputes "on the merits" and disputes relating to ancillary matters such as are listed in s. 44, and that such a distinction has been recognized in the authorities: see *Ultisol Transport Contractors Ltd. v. Bouygues Offshore Ltd.*, [1996] 2 Lloyd's Rep. 140 at pp. 144-145. Therefore "any dispute" in the parties' clause is to be construed as relating only to disputes on the merits, and if it were otherwise then every arbitration clause would have to be construed as excluding the Court's powers in such ancillary matters, which he submitted would be remarkable and unsatisfactory. *Mantovani v. Carapelli* was to be understood as depending on and therefore limited to the particular terms of the arbitration agreement in that case, with its reference to "other legal proceedings" in its *Scott v. Avery* clause [(1856) 5 H.L.C. 811]. Moreover, s. 44(3)

preserved the power of the Court to act to preserve evidence or assets in the case of urgency.

For the purposes of these submissions it is necessary to set out s. 44 in full:

**44. Court powers exercisable in support of arbitral proceedings**

(1) Unless otherwise agreed by the parties, the court has for the purposes of and in relation to arbitral proceedings the same power of making orders about the matters listed below as it has for the purposes of and in relation to legal proceedings.

(2) Those matters are -

(a) the taking of the evidence of witnesses;

(b) the preservation of evidence;

(c) making orders in relation to property which is the subject of the proceedings or as to which any question arises in the proceedings -

(i) for the inspection, photographing, preservation, custody or detention of the property, or

(ii) ordering that samples be taken from, or any observation be made of or experiment conducted upon, the property;

and for that purpose authorising any person to enter any premises in the possession or control of a party to the arbitration;

(d) the sale of any goods the subject of the proceedings;

(e) the granting of an interim injunction or the appointment of a receiver.

(3) If the case is one of urgency, the court may, on the application of a party or proposed party to the arbitral proceedings, make such orders as it thinks necessary for the purpose of preserving evidence or assets.

(4) If the case is not one of urgency, the court shall act only on the application of a party to the arbitral proceedings (upon notice to the other parties and to the tribunal) made with the permission of the tribunal or the agreement in writing of the other parties.

(5) In any case the court shall act only if or to the extent that the arbitral tribunal, and any arbitral or other institution or person vested by the parties with power in that regard, has no power or is unable for the time being to act effectively.

(6) If the court so orders, an order made by it under this section shall cease to have effect in whole or in part on the order of the tribunal or of any such arbitral or other institution or person

[1999] Vol. 1          LLOYD'S LAW REPORTS          934
Q.B. (Com. Ct.)                 Re Q's Estate                  RIX, J.

having power to act in relation to the subject-matter of the order.

(7) The leave of the court is required for any appeal from a decision of the court under this section.

The provisions of this section may be contrasted with its predecessor in the Arbitration Act, 1950 (the "1950 Act"), s. 12(6):

(6) The High Court shall have, for the purpose of and in relation to a reference, the same power of making orders in respect of . . .

(e) the preservation, interim custody or sale of any goods which are the subject matter of the reference;

(f) securing the amount in dispute in the reference;

(g) the detention, preservation or inspection of any property or thing which is the subject of the reference . . .

(h) interim injunctions or the appointment of a receiver;

as it has for the purpose of and in relation to an action or matter in the High Court;

Provided that nothing in this subsection shall be taken to prejudice any power which may be vested in an arbitrator or umpire of making orders with respect to any of the matters aforesaid.

Mr. Beazley submitted that whereas under the 1996 Act the agreement of the parties "otherwise" would oust the ancillary jurisdiction of the Court, under the 1950 Act that was not so, although as a matter of discretion the Court might be slow to exercise its ancillary powers where the parties had plainly agreed to exclude them. I will assume that contrast to be in principle correct.

In *Mantovani v. Carapelli* a sale of goods contract on GAFTA terms incorporated a GAFTA arbitration agreement in the following form:

26. ARBITRATION

(a) *Any dispute arising out of or under this contract* shall be settled by arbitration in London in accordance with the Arbitration Rules, No. 125, of the Grain and Feed Trade Association Limited, such Rules forming part of this contract and of which both parties hereto shall be deemed to be cognisant.

(b) Neither party hereto, nor any persons claiming under either of them, shall bring *any action or other legal proceedings* against the other of them *in relation to such dispute until such dispute* shall first have been heard and determined by the arbitrators, umpire or Board of Appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly agreed

and declared that the obtaining of an award from the arbitrators, umpire or Board of Appeal, as the case may be, shall be a condition precedent to the right of either party hereto or of any person claiming under either of them to bring *any action or other legal proceedings* against the other of them in respect of any such dispute.

I have put into italics language addressed in the reported judgments of particular importance. It will be observed that cl. 26(b) is a *Scott v. Avery* type clause, and that "any action or other legal proceedings" is a wide phrase.

The parties to the sale contract fell into dispute, and the sellers sought to obtain security for their claim from the Italian Courts. Both parties as it happened were Italian. The security proceedings in Italy caused some financial loss to the buyers, and the buyers sought to recover damages in respect of this loss in the arbitration on the ground that the resort to the Italian Courts was in breach of the arbitration clause. The arbitrators agreed with the buyers in this regard and awarded them damages. On a special case to the English Court Mr. Justice Donaldson at first instance [1978] 2 Lloyd's Rep. 63 upheld the arbitrators' award, saying at pp. 72-73:

First, [Mr. Hallgarten] says that the arbitration clause does not bar all legal proceedings, but only those designed to settle the original dispute between the parties, i.e., whether the sellers or the buyers repudiated the contract, and that the Italian proceedings were not of that nature. I do not accept that submission. The clause prohibits all legal proceedings in respect of the dispute before a final award has been obtained and the Italian proceedings to obtain security for the claim are proceedings in respect of the dispute even if they are not designed to determine it.

Second, he says that the claim for loss caused by the Italian proceedings is not a "dispute arising out of or under this contract" and accordingly the arbitrators had no jurisdiction to entertain it. This, in my judgment, is plainly wrong. Whether the terms of the contract leave the sellers free to seek security for their claim from the Italian Courts and whether, if they do not, the buyers are entitled to any, and if so how much, damages is indeed a "dispute arising out of the contract".

Mr. Beazley relied in particular on the words in the second paragraph of that quotation "Whether the terms of the contract leave the sellers free to seek security for their claim from the Italian Courts. . .is indeed a dispute arising out of the contract'. For my part, I think that emphasis on those words is probably misplaced. The contentions of the parties before the arbitrators set out in the

report at pp. 66-67 reveal that there was no submission to the arbitrators that they lacked jurisdiction to determine whether the arbitration clause prevented resort to the Italian Courts merely for the purpose of seeking security. If there had been such a submission, and the matter had been reserved for the Court, I think it probable that it would be seen that this question was one which went to the jurisdiction of the arbitrators and therefore could not be definitively answered by them. Since, however, that question of jurisdiction was left to the arbitrators (and the Court in any event agreed, for that was the issue on Mr. Hallgarten's first submission), the only remaining question, on the basis that resort to the Italian Courts *had* been in breach of contract, was whether a claim in damages for such breach raised a dispute "arising out of the contract". Plainly, ex hypothesi, it did.

The Court of Appeal [1980] 1 Lloyd's Rep. 375 agreed with Mr. Justice Donaldson. Lord Justice Lawton dealt with Mr. Hallgarten's argument in this passage at p. 381:

It is necessary to look particularly at some of these words. The prohibition is against bringing "any action or other legal proceedings". The words "other legal proceedings" are wide enough to cover proceedings in Italy for the form of order which in England would be called a *Mareva* injunction. Clearly such proceedings were for relief in respect of the dispute. The object was to freeze the buyers' assets pending the making of an award. What happened in Italy was the bringing of "other legal proceedings". Mr. Hallgarten went on to say that, even if that were so (and he did not accept that it was so), they were not proceedings "in respect of any such dispute" as was defined in the first part of the arbitration clause. But, as I have already commented, the first part of the arbitration clause is in very wide terms indeed. It follows, therefore, that the "other legal proceedings" were "in respect of" the wide form of jurisdiction with which the arbitration clause was concerned. For my part, I would construe the words as meaning that any form of application for ancillary relief, and in particular that sought in Italy, was within the arbitration clause.

Lord Justice Lawton later contrasted the situation of seeking ancillary relief in foreign Courts with doing so in the Courts of England, saying (at p. 382) that –

. . .what the parties do if they seek ancillary relief within the jurisdiction of this Court is something which the arbitration clause and the Arbitration Act permits.

Lord Justice Lawton appears there to have considered that an application, for instance, for *Mareva*

relief in England is done ancillary to and in support of arbitration, presumably at that time pursuant to s. 12(6)(f) of the 1950 Act, and not in breach of an arbitration clause, even of the *Scott v. Avery* variety.

Lord Justice Browne was attracted by the submission of Mr. Hallgarten that the terms of cl. 26 only applied to "such legal proceedings as go to the substance or merits of the dispute", because the seeking of ancillary relief abroad was in essence no different from the seeking of such relief in England pursuant to s. 12(6). In the end, however, he too rejected this submission, since "the words of cl. 26 of this particular contract are too clear" (at p. 382). He therefore agreed with the reasons given by both Lord Justice Lawton and Mr. Justice Donaldson.

Lord Justice Megaw also agreed with the judgment of Mr. Justice Donaldson, and cited expressly from it (at pp. 383-384).

Mr Beazley relied on *Mantovani v. Carapelli* for the submission that it was decided on a double ratio: not only did the pursuit of merely ancillary relief fall within the phrase "other legal proceedings" within cl. 26(b), but such proceedings were themselves "in respect of any such dispute" within cl. 26(b) and therefore in respect of "Any dispute arising out of or under this contract" within cl. 26(a). It followed, in his submission, that even without cl. 26(b)'s extended language "any action or other legal proceedings", any pursuit of ancillary proceedings would be a breach of an arbitration clause to the extent that the ancillary proceedings were in respect of a dispute which had to be referred to arbitration. In the light now of the 1996 Act and its deference to party autonomy and in particular to s. 44's permission to agree "otherwise", *Mantovani v. Carapelli* was authority for excluding resort even to the English Court for the purpose of such ancillary orders.

In my judgment that submission is a non sequitur, and I agree with Mr. Hamblen that it would produce surprising results. It would mean that ancillary proceedings, e.g. for security for a claim, were always within an arbitration clause, for it would always be possible to say that the claim for relief was in respect of an underlying substantive dispute which the parties had agreed to arbitrate. If perchance the substantive dispute fell outside the arbitration clause, then there would of course be no problem about the ancillary relief falling outside the clause too, but otherwise a substantive dispute within the arbitration clause would always catch and prevent the claim for ancillary relief. That would have spread into every contract containing an arbitration clause the question which puzzled Lord Justice Lawton and Lord Justice Browne, as to whether an agreement within the terms of cl. 26

would supersede s. 12(6) of the 1950 Act. It would also mean that any arbitration agreement would, even in the absence of the language of cl. 26(b), have prevented the obtaining of ancillary relief anywhere in the world, a conclusion which appears to fly in the face of reality. In my judgment, however, there is nothing in *Mantovani v. Carapelli* to require me to reach the view that the result in that case would have been the same even if cl. 26(a) had stood by itself. Granted that the question had also to be asked and answered, whether the obtaining of ancillary relief was "in respect of any such dispute" such as was covered in cl. 26(a). Granted also that Lord Justice Lawton, in answering that question, placed stress (at p. 381) on the width of the phrase "Any dispute arising out of or under this contract". Nevertheless, I do not think that the question lends itself to much doubt, and certainly neither Mr. Justice Donaldson nor Lord Justice Megaw saw any difficulty in it. It is, however, another and primary question whether merely ancillary proceedings, which do not put the substantive merits of the parties' dispute in issue, are within the arbitration clause. That question, it seems to me, was determined on the language of cl. 26(b) and in particular on the extended phrase "any action or other legal proceedings". Mr. Justice Donaldson, in dealing with Mr. Hallgarten's first submission, fastened on the words "legal proceedings" and held that "proceedings to obtain security for the claim are proceedings in respect of the dispute even if they are not designed to determine it". Lord Justice Lawton expressly stated that "The words other legal proceedings' are wide enough to cover proceedings in Italy for the form of order which in England would be called a *Mareva* injunction". Lord Justice Browne and Lord Justice Megaw both agreed with Mr. Justice Donaldson. Lord Justice Browne agreed with Lord Justice Lawton's reasons and said that cl. 26 "does prohibit the taking of proceedings in Italy for security", and Lord Justice Megaw quoted Mr. Justice Donaldson verbatim. In my judgment the ratio of *Mantovani v. Carapelli* is not that ancillary proceedings in the Courts are always a breach of an arbitration clause, but that they were in that case by reason of the wide language of cl. 26(b).

It remains to be seen how *Mantovani v. Carapelli* and this question have fared in subsequent authorities.

In *Toepfer International G.m.b.H. v. Société Cargill France*, [1998] 1 Lloyd's Rep. 379 the same GAFTA arbitration clause, now numbered cl. 32, was considered again. Mr. Justice Colman had granted an *Angelic Grace* anti-suit injunction in defence of GAFTA arbitration to prevent substantive proceedings in France being taken by the defendant buyers. The case raised both contractual

issues and other issues under the Brussels Convention. The latter were referred to the European Court. The primary contractual issue was whether the *Scott v. Avery* provisions in cl. 32(b) prevented the plaintiff sellers from seeking an anti-suit injunction from the English Court. It was in this context that the Court of Appeal considered *Mantovani v. Carapelli*, and in particular the dicta there regarding the ability to bring ancillary proceedings in England pursuant to s. 12(6) of the 1950 Act. Giving the judgment of the Court, Lord Justice Phillips said this (at p. 385):

We have not found very satisfactory an approach which, as a matter of implication, applies a *Scott v. Avery* clause to ancillary proceedings outside England but not to ancillary proceedings within the English Court. Be that as it may, we are satisfied that, as a matter of construction, a *Scott v. Avery* clause cannot apply to injunctive proceedings brought for the purpose of enforcing the clause itself. Insofar as an issue arises, it is likely to be as to whether or not the substantive dispute falls within the jurisdiction of the arbitrators, which is not a suitable issue for determination by the arbitrators themselves. More significantly, an injunction does not fall within the relief that arbitrators are in a position to provide. For these reasons, which are narrower than those of the Judge, we hold that the *Scott v. Avery* clause in cl. 32 did not preclude Mr. Justice Colman from entertaining the claim for relief that was before him.

I do not find anything in that citation to call in question my analysis of the ratio of *Mantovani v. Carapelli*.

Subsequently, Lord Justice Phillips indicated (at p. 386) that -

. . . .we would, if permitted, construe cl. 32 as relating to disputes of substance, rather than in relation to ancillary relief . . .

That indicates that the Court in *Toepfer v. Cargill* had doubts about the correctness of the decision in *Mantovani v. Carapelli* while recognizing that it was bound by it: but it does not affect the ratio of the latter case, and it gives no impetus towards broadening its rationale wider than is necessary.

In *Petromin S.A. v. Secnav Marine Ltd.*, [1995] 1 Lloyd's Rep. 603 proceedings in the English Court arose out of a London arbitration commenced pursuant to an arbitration clause which referred simply to "any dispute arising under this charter". The plaintiff sought an injunction inter alia to prevent the defendant from attempting to arrest any vessel or other asset belonging to the plaintiff for the purpose of obtaining security in respect of the defendant's counterclaim in the arbitration. Mr. Justice Colman said this (at p. 613):

Where, however, the sole purpose of the commencement of proceedings in a foreign Court is to accomplish the arrest of a vessel in order to provide security in respect of a claim which by reason of an exclusive jurisdiction clause must be brought in a particular Court or by reason of an arbitration clause must be referred to arbitration, it has long been the practice - certainly in the Admiralty Court - for an injunction against the foreign proceedings or a stay of English proceedings only to be granted on terms that alternative security is provided by the party applying for such injunction: see, for example, *The Eleftheria*, [1969] 1 Lloyd's Rep. 237 at p. 246; [1970] P. 94 at p. 105; *The Atlantic Star*, [1973] 2 Lloyd's Rep. 446; [1974] A.C. 436 and *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] 1 Q.B. 377. In the last case, Mr. Justice Brandon strongly emphasized at p. 559, col. 1; p. 404 the distinction between choice of forum for the purposes of dispute resolution on the one hand and the right to take proceedings in rem to obtain security on the other in the following words:

If this distinction between choice of forum on the one hand and right to security on the other is recognized and given effect to in foreign jurisdiction clause cases and vexation cases, I cannot see any good reason why it should not equally be recognized and given effect to in arbitration cases, whether the grant of a stay is discretionary under s. 4(1) of the Arbitration Act, 1950, or, as in the present case, mandatory under s. 1(1) of the Arbitration Act, 1975.

I would like to stress again in this connection also that the distinction in question is clearly recognized and given effect to by the International Convention for the Arrest of Seagoing Ships 1952.

This distinction clearly underlies the decision of the Court of Appeal in *The Lisboa*, [1980] 2 Lloyd's Rep. 546, a case concerned with an application for a mandatory injunction to restrain an arrest in an overseas jurisdiction in breach of an exclusive jurisdiction clause. In *The Angelic Grace* Lord Justice Leggatt treated that case as representing an exception to the general rule. It is further clear that in the latter case the Court of Appeal was treating the principles applicable to injunctions to enforce arbitration clauses as substantially the same as those applying to exclusive jurisdiction clauses.

It follows that in the present case, were it not for the fact that the counterclaim has been stayed, attempts by the defendants to arrest the plaintiffs' vessels in foreign jurisdictions *solely* in order to obtain security for the counterclaim would not

generally be restrained by injunction unless the plaintiffs tendered security in lieu of arrest, but that proceedings in a foreign jurisdiction which were not confined to the obtaining of security and which extended to the determination of issues in the arbitration would normally be restrained.

This distinction between suits upon the merits and ancillary proceedings solely to obtain security was recognized again in *Ultisol Transport Contractors Ltd. v. Bouygues Offshore S.A. (No. 1)*, [1996] 2 Lloyd's Rep. 140 at pp. 144-145, albeit in that case the exclusive English jurisdiction clause expressly allowed "the option to bring proceedings in rem to obtain conservative seizure or other similar remedy. . .in any state or jurisdiction where such vessel or property may be found". Mr. Justice Clarke held that such option was limited to the bringing of proceedings for the purpose of obtaining security but did not permit proceedings for other purposes. He added (at p. 145):

That construction of the clause makes perfect sense. It makes the same distinction as is drawn in [*Petromin v. Secnav* and *The Rena K*] referred to above and, more importantly it gives meaning to the expression -

. . .any dispute or difference. . .shall be referred to the High Court of Justice in London . . .

in the first paragraph of the clause.

*Ultisol v. Bouygues (No. 1)* was reversed in the Court of Appeal in *Bouygues Offshore S.A. v. Caspian Shipping Co. (Nos. 1, 3, 4 and 5)*, [1998] 2 Lloyd's Rep. 461, but not on this point.

*Mantovani v. Carapelli* was not cited in either *Petromin v. Secnav* or *Ultisol v. Bouygues (No. 1)*: but those cases, as well as *The Rena K*, [1978] 1 Lloyd's Rep. 545, illustrate the good sense, in my judgment, of confining the decision in *Mantovani v. Carapelli* to its true ratio, which depends on the width of language found in its *Scott v. Avery* clause and its reference to "other legal proceedings". It would follow that in the absence of similar language in the arbitration clause in this case, this Court is not deprived of jurisdiction to grant a *Mareva* injunction in support of arbitration between the parties to these proceedings.

Mr. Beazley nevertheless submits that the use of the word "exclusive" in the arbitration clause in this case ("will be submitted to the exclusive jurisdiction of arbitration in London") is in any event to be given the same effect, in that it demonstrates the parties' intention to exclude from the Courts all ancillary proceedings as well as proceedings on the substantive merits. In this connection he again emphasizes the permissive opening words of s. 44 - "Unless otherwise agreed by

[1999] Vol. 1                    LLOYD'S LAW REPORTS                                938
Q.B. (Com. Ct.)                     Re Q's Estate                               RIX, J.

the parties. . ." He sought to support that submission by reference to the confidential and sensitive nature of the subject matter of the retainer agreement, which the parties could be supposed to wish to keep from coming into the public domain through the channel of ancillary proceedings in the Court. In the same vein, he said, was the exclusion of any right of appeal ("and not subject to appeal").

I do not think this submission is correct. Arbitration is in any event an exclusive jurisdiction, and an arbitration clause was treated as equivalent to an exclusive jurisdiction clause in *The Angelic Grace*, [1995] 1 Lloyd's Rep. 87, as Mr. Justice Colman himself pointed out in *Petromin v. Secnav*. In my judgment, therefore, the word "exclusive" in the present clause is merely intended to underline the general rule, which is that substantive proceedings must be by way of arbitration, rather than to introduce the exceptional situation where the parties are barred from ancillary proceedings in Court. The emphasis makes perfectly good sense in the light of the exclusion of any right of appeal. It seems to me that if the parties wanted to exclude the right to resort to the Court under s. 44 for assistance in ancillary matters, they could and should have done so by more specific wording.

A question then arose whether, even where the parties have "otherwise agreed" so as to exclude resort to the Court for the purposes of ancillary relief, nevertheless the Court retained power under s. 44(3) ("If the case is one of urgency. . .") to make an order for the purpose of preserving evidence or assets. Mr. Hamblen submitted that it did, since the agreement of the parties "otherwise" was limited to "the matters listed below" and therefore to s. 44(2). Mr. Beazley on the other hand submitted that the Court did not in such a case retain power under sub-s. (3), since the parties' agreement to exclude the Court's ancillary powers in any event covered the subject matter of sub-s. (3) namely the preserving of evidence or assets (cf. sub-s. (2)(b)(d) and (e)), and also because sub-s. (4) and (5) indicated that the permissions there given to resort to the Court were subject to restrictions even where the parties had not "otherwise agreed", and that it was only those additional statutory restrictions that were lifted in the event of urgency for the purpose of sub-s. (3). I am inclined to think that Mr. Beazley is right about this, since otherwise sub-s. (3) would be a mandatory provision for the purpose of s. 4, whereas s. 44 is not listed at all among the mandatory provisions listed in Schedule 1 to the 1996 Act. However, I do not have to decide the point, because in my view the parties have not "otherwise agreed".

In conclusion, therefore, this Court did not lack jurisdiction to make the *Mareva* order that it was

asked to make by reason of the terms of the arbitration clause in this case. The *Mareva* order was discharged on the merits and not on the ground of any lack of jurisdiction.

**The Veracruz I: can a *Mareva* injunction be sought quia timet?**

In *The Veracruz I* the Court of Appeal decided that without an accrued cause of action a plaintiff could not obtain a *Mareva* injunction. They considered that their decision was forced on them by *The Siskina*, [1978] 1 Lloyd's Rep. 1; [1979] A.C. 210. The "sensible and desirable approach" (per Sir John Megaw at p. 361) adopted by Mr. Justice Saville in *A v. B*, [1989] 2 Lloyd's Rep. 423, whereby an injunction was granted prior to the falling in of the anticipated cause of action but its operation was suspended until the cause of action arose, was therefore not open. *The Veracruz I* was a case, not in principle unlike the present case, where a cause of action for the defective condition of a ship subject to a sale contract was expected to accrue upon its imminent delivery to the buyer, in circumstances where it was to be supposed that the purchase price would be removed from the jurisdiction as soon as it was paid. That decision was reconsidered and followed in *Zucker v. Tyndall Holdings Plc.*, [1992] 1 W.L.R. 1127.

It was against this background that Mr. Hamblen appeared before me on the day before the scheduled completion of the beneficiaries' settlement of the daughter's claim, and therefore at a time when the lawyers' cause of action for their contingency fee had not yet quite materialized, to inform the Court that he would be seeking a *Mareva* injunction on the lawyers' behalf on the following day as soon as the completion had taken place. It was of course important to the lawyers to be able to act quickly once the moneys had been transferred to the daughter, as they feared that she would not lose much time in transferring them out of the jurisdiction. Thus on the day before completion I was shown the lawyers' evidence and had the matter explained to me, and on the following day I was able, with the assurance of Mr. Hamblen that the completion had now taken place but that in all other respects nothing material had changed, to grant the injunction which I had already indicated I would in principle be willing to grant once the lawyers' cause of action had arisen. It seemed to me that this procedure, although perhaps unorthodox, successfully answered the real need which Mr. Justice Saville had sought to answer, and in a way which fell outside the technical reason, divorced from the merits of the case, which had caused the Court of Appeal to feel obliged to reject the procedure adopted by Mr. Justice Saville in *A v. B* and also at

[1999] Vol. 1                    **LLOYD'S LAW REPORTS**                    939
Q.B. (Com. Ct.)                          Re Q's Estate                         RIX, J.

first instance by Mr. Justice Hobhouse in *The Veracruz I.*

When the parties subsequently came before me inter partes, Mr. Beazley, although anxious to submit, for the reasons discussed earlier in this judgment, that there was no jurisdiction to grant a *Mareva* injunction ancillary to arbitration in this case, nevertheless had no complaint about the procedure adopted by Mr. Hamblen and sanctioned by me at the ex parte stage. In my judgment, it is a valid procedure, but of course the Court will be astute to seek to ensure that it is used properly and without abuse.

In writing this, I am reminded by way of a postscript that the question of whether the rule in *The Veracruz I* covers the case of a contingent cause of action for an indemnity where the underlying liability has not yet been established or the indemnified has not yet suffered loss was considered by me in *Rowland v. Gulfpac Ltd.*, (unreported, July 24, 1995). The question of a cause of action for an indemnity is not I think this case, and the matter

there was addressed by me on an obiter basis, although after full argument. However, I considered the indemnity cases which contain an equity component (see at pp. 28-39 of the transcript) and concluded at pp. 38-39 as follows:

In my judgment none of the line of cases ending in *Zucker v. Tyndall Holdings Plc.* was concerned with equitable rights. In law it is clear on present authority that there must be a preexisting cause of action in law, although the position may be said not to be fully worked out, perhaps, where there is a repudiatory breach. In equity, however, the position is more fluid and it is also clear that there is a line of authority that equity will lend a hand, in advance of the appropriate time at law, to prevent injustice where the right is clear and the danger is clear, too.

*Rowland v. Gulfpac* subsequently went to the Court of Appeal (sub nom. *Inoco Plc. v. Gulf USA Corporation*, unreported Jan. 24, 1997), but on a different point.

[1999] Vol. 1                    LLOYD'S LAW REPORTS                                  931

## QUEEN'S BENCH DIVISION
## (COMMERCIAL COURT)

Mar. 12, 1999

IN RE Q's ESTATE

Before Mr. Justice RIX

**Practice - Mareva injunction - Jurisdiction - Arbitration clause - Daughter entered into retainer agreement with lawyers in relation to claim to share in father's estate - Retainer agreement contained arbitration clause - Claim successful - Lawyers obtained Mareva injunction - Whether Court had jurisdiction to grant injunction because parties had agreed all disputes to be within exclusive jurisdiction of arbitration tribunal - Arbitration Act, 1996, s. 44.**

The daughter of a wealthy man, Q, having been left out of his will, sought to challenge the dispositions of his estate by bringing proceedings against other members of her family in the foreign country where she lived. She entered into a retainer with a leading firm of lawyers in that country under which they would act for her in relation to her claim to share in the estate, on the basis of a contingency fee. The retainer agreement contained an English law and London arbitration clause in the following terms:

This Agreement shall be governed by and construed in accordance with the provisions of English Law any disputes deriving [from] or in connection with this agreement will be submitted to the exclusive jurisdiction of arbitration in London under the London Arbitration Act as amended. . .The award of the arbitral tribunal shall be final, immediately enforceable and not subject to appeal.

The daughter's legal challenge to her father's will was successful in that the beneficiaries agreed to settle her claim for a very large sum of money. The completion took place in London on Oct. 7, 1998 and the cash was paid into an account in Jersey.

The lawyers were fearful that they would not be paid their fee, which under the retainer was to be 5 per cent. of the daughter's recovery. The fee itself amounted to a substantial sum and they sought to protect their claim by bringing proceedings in England inter alia for a *Mareva* injunction over the proceeds of the settlement. On Oct. 7, 1998 an injunction was granted on the lawyers' ex parte application.

The daughter applied to discharge the *Mareva* injunction and to stay the proceedings for arbitration.

The daughter submitted that the Court had no jurisdiction to grant ancillary relief in respect of the lawyers' claim because the arbitration tribunal to be appointed under the retainer agreement's arbitration clause was to have "exclusive jurisdiction" over "any dispute deriving [from] or in connection with" that agreement. The daughter relied on s. 44 of the Arbitration Act, 1996 which provided inter alia:

(1) Unless otherwise agreed by the parties, the court has for the purposes of and in relation to arbitral proceedings the same power of making

orders about the matters listed below as it has for the purposes of and in relation to legal proceedings.

(2) Those matters are -. . .(e) the granting of an interim injunction . . .

(3) If the case is one of urgency, the court may, on the application of a party or proposed party to the arbitral proceedings, make such orders as it thinks necessary for the purpose of preserving evidence or assets.

The daughter submitted that the parties had "otherwise agreed" because "any dispute deriving [from] or in connection with" the retainer agreement embraced a dispute as to the granting of the *Mareva* injunction sought by the lawyers.

The lawyers submitted that a distinction had to be made between disputes "on the merits" and disputes relating to ancillary matters such as were listed in s. 44. "Any dispute" in the parties' clause was to be construed as relating only to disputes on the merits, and if it were otherwise then every arbitration clause would have to be construed as excluding the Court's powers in such ancillary matters, which would be remarkable and unsatisfactory.

-*Held*, by Q.B. (Com. Ct.) (RIX, J.), that (1) the injunction would be discharged (*see* p. 932, col. 2);

(2) arbitration was in any event an exclusive jurisdiction; the word "exclusive" was merely intended to underline the general rule, which was that substantive proceedings must be by way of arbitration, rather than to introduce the exceptional situation where the parties were barred from ancillary proceedings in Court; the emphasis made good sense in the light of the exclusion of any right of appeal; and if the parties wanted to exclude the right to resort to the Court under s. 44 for assistance in ancillary matters they could and should have done so by more specific wording (*see* p. 938, col. 1);

-*Mantovani v. Carapelli S.p.A.*, [1978] 2 Lloyd's Rep. 63, considered.

(3) the Court did not lack jurisdiction to make the *Mareva* order that it was asked to make by reasons of the terms of the arbitration clause; the *Mareva* order was discharged on the merits and not on the grounds of any lack of jurisdiction (*see* p. 938, cols. 1 and 2);

(4) a *Mareva* injunction cannot be granted before a cause of action has arisen, but in anticipation of the imminent arising of a cause of action the Court can be approached to apprise it of the request for an injunction that will be made once the cause of action has arisen and to ask the Court to indicate whether it would in principle be willing to grant an injunction at such time; but the Court will be astute to ensure that such a procedure was used properly and without abuse (*see* p. 938, col. 2; p. 939, col. 1);

-*The Veracruz I*, [1992] 1 Lloyd's Rep. 353, distinguished.

The following cases were referred to in the judgment:

A v. B, [1989] 2 Lloyd's Rep. 423;

*Angelic Grace*, The [1995] 1 Lloyd's Rep. 87;

| [1999] Vol. 1 | LLOYD'S LAW REPORTS | 932 |
| Q.B. (Com. Ct.) | Re Q's Estate | RIX, J. |

Bouygues Offshore S.A. v. Caspian Shipping Co. (Nos. 1, 3, 4 and 5), (C.A.) [1998] 2 Lloyd's Rep. 461;

Mantovani v. Carapelli S.p.A, (C.A.) [1980] 1 Lloyd's Rep. 375; [1978] 2 Lloyd's Rep. 63;

Petromin S.A. v. Secnav Marine Ltd., [1995] 1 Lloyd's Rep. 603;

*Rena K,* The [1978] 1 Lloyd's Rep. 545;

Rowland v. Gulfpac (sub nom. Inoco Plc. v. Gulf USA Corporation), (C.A.) Jan. 24, 1997, unreported; July 24, 1995 unreported;

Scott v. Avery, (H.L.) (1856) 5 H.L.C. 811;

*Siskina,* The (H.L.) [1978] 1 Lloyd's Rep. 1; [1979] A.C. 210;

Toepfer International G.m.b.H. v. Société Cargill France, [1998] 1 Lloyd's Rep. 379;

Ultisol Transport Contractors Ltd. v. Bouygues Offshore S.A. (No. 1), [1996] 2 Lloyd's Rep. 140;

*Veracruz I,* The (C.A.) [1992] 1 Lloyd's Rep. 353;

Zucker v. Tyndall Holdings Plc., [1992] 1 W.L.R. 1127.

---

This was an issue as to whether the Court lacked all jurisdiction to grant a *Mareva* injunction because the parties had agreed that all disputes deriving from their agreement, including a dispute relating to ancillary remedy should be within the exclusive jurisdiction of the arbitration tribunal.

Mr. Nicholas Hamblen, Q.C. (instructed by Messrs. Ince & Co.) for the plaintiff; Mr. T. Beazley (instructed by Messrs. Peters & Peters) for the defendants.

The further facts are stated in the judgment of Mr. Justice Rix which was given in Chambers but has been released for publication.

### JUDGMENT

**Mr. Justice RIX:**

The daughter of a wealthy man, Q, having been left out of his will, sought to challenge the dispositions of his estate by bringing proceedings against other members of her family in the foreign country where she lived. She entered into a retainer with a leading firm of lawyers in that country, under which they would act for her, in relation to her claim to a share in the estate, on the basis of a contingency fee. Her legal challenge to her father's will was successful, in that the beneficiaries agreed to settle her claim for a very large sum of money. The completion took place in London, at about 16 00 hours on Oct. 7, 1998, and the cash was paid into an account in Jersey.

The lawyers were fearful that they would not be paid their fee, which under the retainer was to be 5 per cent. of the daughter's recovery. The fee itself amounted to a substantial sum. They therefore sought to protect their claim by bringing proceedings in England, inter alia for a *Mareva* injunction over the proceeds of the settlement. On Oct. 7, 1998, at 16 25 hours, I granted such an injunction on the lawyers ex parte application. On Oct. 8 I granted leave to bring similar proceedings in Jersey.

The writ, which claimed the fee under the retainer agreement, was served together with the order for a *Mareva* injunction at the daughter's hotel in London on the evening of Oct. 7. There was at one time a dispute about whether proper service was effected, but I have not heard any argument about that.

The retainer agreement, which primarily contemplated proceedings in the foreign country but also "out of Court" proceedings in other countries as necessary, contained an English law and London arbitration clause in the following terms:

This Agreement shall be governed by and construed in accordance with the provisions of English Law any disputes deriving [from] or in connection with this agreement will be submitted to the exclusive jurisdiction of arbitration in London under the London Arbitration Act as amended. . .The award of the arbitral tribunal shall be final, immediately enforceable and not subject to appeal.

On Oct. 29 and Nov. 3, 1998 I heard the daughter's application, inter partes, to discharge the *Mareva* injunction and to stay the proceedings for arbitration. It was common ground that the merits of the lawyers' claim for their fee should be stayed for arbitration, but the question of the ancillary order for a *Mareva* was the subject of much controversy. I heard in this connection two primary arguments. The first was that the Court lacked all jurisdiction to grant a *Mareva* injunction because the parties had agreed that all disputes deriving from their agreement, including a dispute relating to such an ancillary remedy, should be within the exclusive jurisdiction of the arbitral tribunal. The second was that in any event the lawyers failed to show a real risk that the daughter would not pay any award against her.

At the close of the hearing, I gave an ex tempore judgment in favour of the daughter on the second ground, discharged the injunction and stayed all proceedings for arbitration. I did not require, but I was offered, an undertaking on behalf of the daughter that she would meet any award made against her, and that undertaking is recorded in my order. However, I reserved judgment on the question of

[1999] Vol. 1
Q.B. (Com. Ct.)

LLOYD'S LAW REPORTS
Re Q's Estate

933
RIX, J.

my jurisdiction, for it raised an interesting point of general importance under the new Arbitration Act, 1996.

It is that question that I deal with in this judgment. I shall also refer below to another question of jurisdiction concerning the power of the Court to grant a *Mareva* injunction at a time when a breach of contract is feared but a cause of action has not yet arisen: cf. *The Veracruz I*, [1992] 1 Lloyd's Rep. 353.

**Section 44 of the Arbitration Act, 1996 - "Unless otherwise agreed"**

Mr. Beazley, on behalf of the daughter, submitted that the Court had no jurisdiction to grant ancillary relief in respect of the lawyers' claim because the arbitral tribunal to be appointed under the retainer agreement's arbitration clause was to have "exclusive jurisdiction" over "any dispute deriving [from] or in connection with" that agreement. In this connection he relied on the opening words, "Unless otherwise agreed. . .", of s. 44 of the Arbitration Act, 1996 (the "1996 Act"). That section confirms that the Court has the same power of making orders in relation to arbitral proceedings about inter alia the preservation of evidence and (of particular importance for present purposes) the granting of an interim injunction as it has in relation to legal proceedings - "Unless otherwise agreed by the parties". The submission was that the parties here had "otherwise agreed" because "any dispute deriving [from] or in connection with" the retainer agreement embraced a dispute as to the granting of the *Mareva* injunction sought by the lawyers. In this connection Mr. Beazley relied on *Mantovani v. Carapelli S.p.A.*, [1978] 2 Lloyd's Rep. 63 (Mr. Justice Donaldson); [1980] 1 Lloyd's Rep. 375 (C.A.).

On behalf of the lawyers, Mr. Hamblen, Q.C., submitted on the other hand that a distinction has to be made between disputes "on the merits" and disputes relating to ancillary matters such as are listed in s. 44, and that such a distinction has been recognized in the authorities: see *Ultisol Transport Contractors Ltd. v. Bouygues Offshore Ltd.*, [1996] 2 Lloyd's Rep. 140 at pp. 144-145. Therefore "any dispute" in the parties' clause is to be construed as relating only to disputes on the merits, and if it were otherwise then every arbitration clause would have to be construed as excluding the Court's powers in such ancillary matters, which he submitted would be remarkable and unsatisfactory. *Mantovani v. Carapelli* was to be understood as depending on and therefore limited to the particular terms of the arbitration agreement in that case, with its reference to "other legal proceedings" in its *Scott v. Avery* clause [(1856) 5 H.L.C. 811]. Moreover, s. 44(3)

preserved the power of the Court to act to preserve evidence or assets in the case of urgency.

For the purposes of these submissions it is necessary to set out s. 44 in full:

**44. Court powers exercisable in support of arbitral proceedings**

(1) Unless otherwise agreed by the parties, the court has for the purposes of and in relation to arbitral proceedings the same power of making orders about the matters listed below as it has for the purposes of and in relation to legal proceedings.

(2) Those matters are -

(a) the taking of the evidence of witnesses;

(b) the preservation of evidence;

(c) making orders in relation to property which is the subject of the proceedings or as to which any question arises in the proceedings -

(i) for the inspection, photographing, preservation, custody or detention of the property, or

(ii) ordering that samples be taken from, or any observation be made of or experiment conducted upon, the property;

and for that purpose authorising any person to enter any premises in the possession or control of a party to the arbitration;

(d) the sale of any goods the subject of the proceedings;

(e) the granting of an interim injunction or the appointment of a receiver.

(3) If the case is one of urgency, the court may, on the application of a party or proposed party to the arbitral proceedings, make such orders as it thinks necessary for the purpose of preserving evidence or assets.

(4) If the case is not one of urgency, the court shall act only on the application of a party to the arbitral proceedings (upon notice to the other parties and to the tribunal) made with the permission of the tribunal or the agreement in writing of the other parties.

(5) In any case the court shall act only if or to the extent that the arbitral tribunal, and any arbitral or other institution or person vested by the parties with power in that regard, has no power or is unable for the time being to act effectively.

(6) If the court so orders, an order made by it under this section shall cease to have effect in whole or in part on the order of the tribunal or of any such arbitral or other institution or person

having power to act in relation to the subject-matter of the order.

(7) The leave of the court is required for any appeal from a decision of the court under this section.

The provisions of this section may be contrasted with its predecessor in the Arbitration Act, 1950 (the "1950 Act"), s. 12(6):

(6) The High Court shall have, for the purpose of and in relation to a reference, the same power of making orders in respect of . . .

(e) the preservation, interim custody or sale of any goods which are the subject matter of the reference;

(f) securing the amount in dispute in the reference;

(g) the detention, preservation or inspection of any property or thing which is the subject of the reference . . .

(h) interim injunctions or the appointment of a receiver;

as it has for the purpose of and in relation to an action or matter in the High Court;

Provided that nothing in this subsection shall be taken to prejudice any power which may be vested in an arbitrator or umpire of making orders with respect to any of the matters aforesaid.

Mr. Beazley submitted that whereas under the 1996 Act the agreement of the parties "otherwise" would oust the ancillary jurisdiction of the Court, under the 1950 Act that was not so, although as a matter of discretion the Court might be slow to exercise its ancillary powers where the parties had plainly agreed to exclude them. I will assume that contrast to be in principle correct.

In *Mantovani v. Carapelli* a sale of goods contract on GAFTA terms incorporated a GAFTA arbitration agreement in the following form:

26. ARBITRATION

(a) *Any dispute arising out of or under this contract* shall be settled by arbitration in London in accordance with the Arbitration Rules, No. 125, of the Grain and Feed Trade Association Limited, such Rules forming part of this contract and of which both parties hereto shall be deemed to be cognisant.

(b) Neither party hereto, nor any persons claiming under either of them, shall bring *any action or other legal proceedings* against the other of them *in relation to such dispute until such dispute* shall first have been heard and determined by the arbitrators, umpire or Board of Appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly agreed

and declared that the obtaining of an award from the arbitrators, umpire or Board of Appeal, as the case may be, shall be a condition precedent to the right of either party hereto or of any person claiming under either of them to bring *any action or other legal proceedings* against the other of them in respect of any such dispute.

I have put into italics language addressed in the reported judgments of particular importance. It will be observed that cl. 26(b) is a *Scott v. Avery* type clause, and that "any action or other legal proceedings" is a wide phrase.

The parties to the sale contract fell into dispute, and the sellers sought to obtain security for their claim from the Italian Courts. Both parties as it happened were Italian. The security proceedings in Italy caused some financial loss to the buyers, and the buyers sought to recover damages in respect of this loss in the arbitration on the ground that the resort to the Italian Courts was in breach of the arbitration clause. The arbitrators agreed with the buyers in this regard and awarded them damages. On a special case to the English Court Mr. Justice Donaldson at first instance [1978] 2 Lloyd's Rep. 63 upheld the arbitrators' award, saying at pp. 72-73:

First, [Mr. Hallgarten] says that the arbitration clause does not bar all legal proceedings, but only those designed to settle the original dispute between the parties, i.e., whether the sellers or the buyers repudiated the contract, and that the Italian proceedings were not of that nature. I do not accept that submission. The clause prohibits all legal proceedings in respect of the dispute before a final award has been obtained and the Italian proceedings to obtain security for the claim are proceedings in respect of the dispute even if they are not designed to determine it.

Second, he says that the claim for loss caused by the Italian proceedings is not a "dispute arising out of or under this contract" and accordingly the arbitrators had no jurisdiction to entertain it. This, in my judgment, is plainly wrong. Whether the terms of the contract leave the sellers free to seek security for their claim from the Italian Courts and whether, if they do not, the buyers are entitled to any, and if so how much, damages is indeed a "dispute arising out of the contract".

Mr. Beazley relied in particular on the words in the second paragraph of that quotation "Whether the terms of the contract leave the sellers free to seek security for their claim from the Italian Courts. . .is indeed a dispute arising out of the contract'. For my part, I think that emphasis on those words is probably misplaced. The contentions of the parties before the arbitrators set out in the

| [1999] Vol. 1 | LLOYD'S LAW REPORTS | 935 |
| Q.B. (Com. Ct.) | Re Q's Estate | RIX, J. |

report at pp. 66-67 reveal that there was no submission to the arbitrators that they lacked jurisdiction to determine whether the arbitration clause prevented resort to the Italian Courts merely for the purpose of seeking security. If there had been such a submission, and the matter had been reserved for the Court, I think it probable that it would be seen that this question was one which went to the jurisdiction of the arbitrators and therefore could not be definitively answered by them. Since, however, that question of jurisdiction was left to the arbitrators (and the Court in any event agreed, for that was the issue on Mr. Hallgarten's first submission), the only remaining question, on the basis that resort to the Italian Courts *had* been in breach of contract, was whether a claim in damages for such breach raised a dispute "arising out of the contract". Plainly, ex hypothesi, it did.

The Court of Appeal [1980] 1 Lloyd's Rep. 375 agreed with Mr. Justice Donaldson. Lord Justice Lawton dealt with Mr. Hallgarten's argument in this passage at p. 381:

It is necessary to look particularly at some of these words. The prohibition is against bringing "any action or other legal proceedings". The words "other legal proceedings" are wide enough to cover proceedings in Italy for the form of order which in England would be called a *Mareva* injunction. Clearly such proceedings were for relief in respect of the dispute. The object was to freeze the buyers' assets pending the making of an award. What happened in Italy was the bringing of "other legal proceedings". Mr. Hallgarten went on to say that, even if that were so (and he did not accept that it was so), they were not proceedings "in respect of any such dispute" as was defined in the first part of the arbitration clause. But, as I have already commented, the first part of the arbitration clause is in very wide terms indeed. It follows, therefore, that the "other legal proceedings" were "in respect of" the wide form of jurisdiction with which the arbitration clause was concerned. For my part, I would construe the words as meaning that any form of application for ancillary relief, and in particular that sought in Italy, was within the arbitration clause.

Lord Justice Lawton later contrasted the situation of seeking ancillary relief in foreign Courts with doing so in the Courts of England, saying (at p. 382) that -

. . .what the parties do if they seek ancillary relief within the jurisdiction of this Court is something which the arbitration clause and the Arbitration Act permits.

Lord Justice Lawton appears there to have considered that an application, for instance, for *Mareva*

relief in England is done ancillary to and in support of arbitration, presumably at that time pursuant to s. 12(6)(f) of the 1950 Act, and not in breach of an arbitration clause, even of the *Scott v. Avery* variety.

Lord Justice Browne was attracted by the submission of Mr. Hallgarten that the terms of cl. 26 only applied to "such legal proceedings as go to the substance or merits of the dispute", because the seeking of ancillary relief abroad was in essence no different from the seeking of such relief in England pursuant to s. 12(6). In the end, however, he too rejected this submission, since "the words of cl. 26 of this particular contract are too clear" (at p. 382). He therefore agreed with the reasons given by both Lord Justice Lawton and Mr. Justice Donaldson.

Lord Justice Megaw also agreed with the judgment of Mr. Justice Donaldson, and cited expressly from it (at pp. 383-384).

Mr Beazley relied on *Mantovani v. Carapelli* for the submission that it was decided on a double ratio: not only did the pursuit of merely ancillary relief fall within the phrase "other legal proceedings" within cl. 26(b), but such proceedings were themselves "in respect of any such dispute" within cl. 26(b) and therefore in respect of "Any dispute arising out of or under this contract" within cl. 26(a). It followed, in his submission, that even without cl. 26(b)'s extended language "any action or other legal proceedings", any pursuit of ancillary proceedings would be a breach of an arbitration clause to the extent that the ancillary proceedings were in respect of a dispute which had to be referred to arbitration. In the light now of the 1996 Act and its deference to party autonomy and in particular to s. 44's permission to agree "otherwise", *Mantovani v. Carapelli* was authority for excluding resort even to the English Court for the purpose of such ancillary orders.

In my judgment that submission is a non sequitur, and I agree with Mr. Hamblen that it would produce surprising results. It would mean that ancillary proceedings, e.g. for security for a claim, were always within an arbitration clause, for it would always be possible to say that the claim for relief was in respect of an underlying substantive dispute which the parties had agreed to arbitrate. If perchance the substantive dispute fell outside the arbitration clause, then there would of course be no problem about the ancillary relief falling outside the clause too, but otherwise a substantive dispute within the arbitration clause would always catch and prevent the claim for ancillary relief. That would have spread into every contract containing an arbitration clause the question which puzzled Lord Justice Lawton and Lord Justice Browne, as to whether an agreement within the terms of cl. 26

would supersede s. 12(6) of the 1950 Act. It would also mean that any arbitration agreement would, even in the absence of the language of cl. 26(b), have prevented the obtaining of ancillary relief anywhere in the world, a conclusion which appears to fly in the face of reality. In my judgment, however, there is nothing in *Mantovani v. Carapelli* to require me to reach the view that the result in that case would have been the same even if cl. 26(a) had stood by itself. Granted that the question had also to be asked and answered, whether the obtaining of ancillary relief was "in respect of any such dispute" such as was covered in cl. 26(a). Granted also that Lord Justice Lawton, in answering that question, placed stress (at p. 381) on the width of the phrase "Any dispute arising out of or under this contract". Nevertheless, I do not think that the question lends itself to much doubt, and certainly neither Mr. Justice Donaldson nor Lord Justice Megaw saw any difficulty in it. It is, however, another and primary question whether merely ancillary proceedings, which do not put the substantive merits of the parties' dispute in issue, are within the arbitration clause. That question, it seems to me, was determined on the language of cl. 26(b) and in particular on the extended phrase "any action or other legal proceedings". Mr. Justice Donaldson, in dealing with Mr. Hallgarten's first submission, fastened on the words "legal proceedings" and held that "proceedings to obtain security for the claim are proceedings in respect of the dispute even if they are not designed to determine it". Lord Justice Lawton expressly stated that "The words other legal proceedings" are wide enough to cover proceedings in Italy for the form of order which in England would be called a *Mareva* injunction". Lord Justice Browne and Lord Justice Megaw both agreed with Mr. Justice Donaldson. Lord Justice Browne agreed with Lord Justice Lawton's reasons and said that cl. 26 "does prohibit the taking of proceedings in Italy for security", and Lord Justice Megaw quoted Mr. Justice Donaldson verbatim. In my judgment the ratio of *Mantovani v. Carapelli* is not that ancillary proceedings in the Courts are always a breach of an arbitration clause, but that they were in that case by reason of the wide language of cl. 26(b).

It remains to be seen how *Mantovani v. Carapelli* and this question have fared in subsequent authorities.

In *Toepfer International G.m.b.H. v. Société Cargill France*, [1998] 1 Lloyd's Rep. 379 the same GAFTA arbitration clause, now numbered cl. 32, was considered again. Mr. Justice Colman had granted an *Angelic Grace* anti-suit injunction in defence of GAFTA arbitration to prevent substantive proceedings in France being taken by the defendant buyers. The case raised both contractual

issues and other issues under the Brussels Convention. The latter were referred to the European Court. The primary contractual issue was whether the *Scott v. Avery* provisions in cl. 32(b) prevented the plaintiff sellers from seeking an anti-suit injunction from the English Court. It was in this context that the Court of Appeal considered *Mantovani v. Carapelli*, and in particular the dicta there regarding the ability to bring ancillary proceedings in England pursuant to s. 12(6) of the 1950 Act. Giving the judgment of the Court, Lord Justice Phillips said this (at p. 385):

We have not found very satisfactory an approach which, as a matter of implication, applies a *Scott v. Avery* clause to ancillary proceedings outside England but not to ancillary proceedings within the English Court. Be that as it may, we are satisfied that, as a matter of construction, a *Scott v. Avery* clause cannot apply to injunctive proceedings brought for the purpose of enforcing the clause itself. Insofar as an issue arises, it is likely to be as to whether or not the substantive dispute falls within the jurisdiction of the arbitrators, which is not a suitable issue for determination by the arbitrators themselves. More significantly, an injunction does not fall within the relief that arbitrators are in a position to provide. For these reasons, which are narrower than those of the Judge, we hold that the *Scott v. Avery* clause in cl. 32 did not preclude Mr. Justice Colman from entertaining the claim for relief that was before him.

I do not find anything in that citation to call in question my analysis of the ratio of *Mantovani v. Carapelli*.

Subsequently, Lord Justice Phillips indicated (at p. 386) that -

. . .we would, if permitted, construe cl. 32 as relating to disputes of substance, rather than in relation to ancillary relief . . .

That indicates that the Court in *Toepfer v. Cargill* had doubts about the correctness of the decision in *Mantovani v. Carapelli* while recognizing that it was bound by it: but it does not affect the ratio of the latter case, and it gives no impetus towards broadening its rationale wider than is necessary.

In *Petromin S.A. v. Secnav Marine Ltd.*, [1995] 1 Lloyd's Rep. 603 proceedings in the English Court arose out of a London arbitration commenced pursuant to an arbitration clause which referred simply to "any dispute arising under this charter". The plaintiff sought an injunction inter alia to prevent the defendant from attempting to arrest any vessel or other asset belonging to the plaintiff for the purpose of obtaining security in respect of the defendant's counterclaim in the arbitration. Mr. Justice Colman said this (at p. 613):

Where, however, the sole purpose of the commencement of proceedings in a foreign Court is to accomplish the arrest of a vessel in order to provide security in respect of a claim which by reason of an exclusive jurisdiction clause must be brought in a particular Court or by reason of an arbitration clause must be referred to arbitration, it has long been the practice - certainly in the Admiralty Court - for an injunction against the foreign proceedings or a stay of English proceedings only to be granted on terms that alternative security is provided by the party applying for such injunction: *see*, for example, *The Eleftheria*, [1969] 1 Lloyd's Rep. 237 at p. 246; [1970] P. 94 at p. 105; *The Atlantic Star*, [1973] 2 Lloyd's Rep. 446; [1974] A.C. 436 and *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] 1 Q.B. 377. In the last case, Mr. Justice Brandon strongly emphasized at p. 559, col. 1; p. 404 the distinction between choice of forum for the purposes of dispute resolution on the one hand and the right to take proceedings in rem to obtain security on the other in the following words:

If this distinction between choice of forum on the one hand and right to security on the other is recognized and given effect to in foreign jurisdiction clause cases and vexation cases, I cannot see any good reason why it should not equally be recognized and given effect to in arbitration cases, whether the grant of a stay is discretionary under s. 4(1) of the Arbitration Act, 1950, or, as in the present case, mandatory under s. 1(1) of the Arbitration Act, 1975.

I would like to stress again in this connection also that the distinction in question is clearly recognized and given effect to by the International Convention for the Arrest of Seagoing Ships 1952.

This distinction clearly underlies the decision of the Court of Appeal in *The Lisboa*, [1980] 2 Lloyd's Rep. 546, a case concerned with an application for a mandatory injunction to restrain an arrest in an overseas jurisdiction in breach of an exclusive jurisdiction clause. In *The Angelic Grace* Lord Justice Leggatt treated that case as representing an exception to the general rule. It is further clear that in the latter case the Court of Appeal was treating the principles applicable to injunctions to enforce arbitration clauses as substantially the same as those applying to exclusive jurisdiction clauses.

It follows that in the present case, were it not for the fact that the counterclaim has been stayed, attempts by the defendants to arrest the plaintiffs' vessels in foreign jurisdictions *solely* in order to obtain security for the counterclaim would not generally be restrained by injunction unless the plaintiffs tendered security in lieu of arrest, but that proceedings in a foreign jurisdiction which were not confined to the obtaining of security and which extended to the determination of issues in the arbitration would normally be restrained.

This distinction between suits upon the merits and ancillary proceedings solely to obtain security was recognized again in *Ultisol Transport Contractors Ltd. v. Bouygues Offshore S.A. (No. 1)*, [1996] 2 Lloyd's Rep. 140 at pp. 144-145, albeit in that case the exclusive English jurisdiction clause expressly allowed "the option to bring proceedings in rem to obtain conservative seizure or other similar remedy. . .in any state or jurisdiction where such vessel or property may be found". Mr. Justice Clarke held that such option was limited to the bringing of proceedings for the purpose of obtaining security but did not permit proceedings for other purposes. He added (at p. 145):

That construction of the clause makes perfect sense. It makes the same distinction as is drawn in *[Petromin v. Secnav* and *The Rena K]* referred to above and, more importantly it gives meaning to the expression -

. . .any dispute or difference. . .shall be referred to the High Court of Justice in London . . .

in the first paragraph of the clause.

*Ultisol v. Bouygues (No. 1)* was reversed in the Court of Appeal in *Bouygues Offshore S.A. v. Caspian Shipping Co. (Nos. 1, 3, 4 and 5)*, [1998] 2 Lloyd's Rep. 461, but not on this point.

*Mantovani v. Carapelli* was not cited in either *Petromin v. Secnav* or *Ultisol v. Bouygues (No. 1)*: but those cases, as well as *The Rena K*, [1978] 1 Lloyd's Rep. 545, illustrate the good sense, in my judgment, of confining the decision in *Mantovani v. Carapelli* to its true ratio, which depends on the width of language found in its *Scott v. Avery* clause and its reference to "other legal proceedings". It would follow that in the absence of similar language in the arbitration clause in this case, this Court is not deprived of jurisdiction to grant a *Mareva* injunction in support of arbitration between the parties to these proceedings.

Mr. Beazley nevertheless submits that the use of the word "exclusive" in the arbitration clause in this case ("will be submitted to the exclusive jurisdiction of arbitration in London") is in any event to be given the same effect, in that it demonstrates the parties' intention to exclude from the Courts all ancillary proceedings as well as proceedings on the substantive merits. In this connection he again emphasizes the permissive opening words of s. 44 - "Unless otherwise agreed by

the parties. . ." He sought to support that submission by reference to the confidential and sensitive nature of the subject matter of the retainer agreement, which the parties could be supposed to wish to keep from coming into the public domain through the channel of ancillary proceedings in the Court. In the same vein, he said, was the exclusion of any right of appeal ("and not subject to appeal").

I do not think this submission is correct. Arbitration is in any event an exclusive jurisdiction, and an arbitration clause was treated as equivalent to an exclusive jurisdiction clause in *The Angelic Grace*, [1995] 1 Lloyd's Rep. 87, as Mr. Justice Colman himself pointed out in *Petromin v. Secnav*. In my judgment, therefore, the word "exclusive" in the present clause is merely intended to underline the general rule, which is that substantive proceedings must be by way of arbitration, rather than to introduce the exceptional situation where the parties are barred from ancillary proceedings in Court. The emphasis makes perfectly good sense in the light of the exclusion of any right of appeal. It seems to me that if the parties wanted to exclude the right to resort to the Court under s. 44 for assistance in ancillary matters, they could and should have done so by more specific wording.

A question then arose whether, even where the parties have "otherwise agreed" so as to exclude resort to the Court for the purposes of ancillary relief, nevertheless the Court retained power under s. 44(3) ("If the case is one of urgency. . .") to make an order for the purpose of preserving evidence or assets. Mr. Hamblen submitted that it did, since the agreement of the parties "otherwise" was limited to "the matters listed below" and therefore to s. 44(2). Mr. Beazley on the other hand submitted that the Court did not in such a case retain power under sub-s. (3), since the parties' agreement to exclude the Court's ancillary powers in any event covered the subject matter of sub-s. (3) namely the preserving of evidence or assets (cf. sub-s. (2)(b)(d) and (e)), and also because sub-s. (4) and (5) indicated that the permissions there given to resort to the Court were subject to restrictions even where the parties had not "otherwise agreed", and that it was only those additional statutory restrictions that were lifted in the event of urgency for the purpose of sub-s. (3). I am inclined to think that Mr. Beazley is right about this, since otherwise sub-s. (3) would be a mandatory provision for the purpose of s. 4, whereas s. 44 is not listed at all among the mandatory provisions listed in Schedule 1 to the 1996 Act. However, I do not have to decide the point, because in my view the parties have not "otherwise agreed".

In conclusion, therefore, this Court did not lack jurisdiction to make the *Mareva* order that it was

asked to make by reason of the terms of the arbitration clause in this case. The *Mareva* order was discharged on the merits and not on the ground of any lack of jurisdiction.

**The Veracruz I: can a *Mareva* injunction be sought quia timet?**

In *The Veracruz I* the Court of Appeal decided that without an accrued cause of action a plaintiff could not obtain a *Mareva* injunction. They considered that their decision was forced on them by *The Siskina*, [1978] 1 Lloyd's Rep. 1; [1979] A.C. 210. The "sensible and desirable approach" (per Sir John Megaw at p. 361) adopted by Mr. Justice Saville in *A v. B*, [1989] 2 Lloyd's Rep. 423, whereby an injunction was granted prior to the falling in of the anticipated cause of action but its operation was suspended until the cause of action arose, was therefore not open. *The Veracruz I* was a case, not in principle unlike the present case, where a cause of action for the defective condition of a ship subject to a sale contract was expected to accrue upon its imminent delivery to the buyer, in circumstances where it was to be supposed that the purchase price would be removed from the jurisdiction as soon as it was paid. That decision was reconsidered and followed in *Zucker v. Tyndall Holdings Plc.*, [1992] 1 W.L.R. 1127.

It was against this background that Mr. Hamblen appeared before me on the day before the scheduled completion of the beneficiaries' settlement of the daughter's claim, and therefore at a time when the lawyers' cause of action for their contingency fee had not yet quite materialized, to inform the Court that he would be seeking a *Mareva* injunction on the lawyers' behalf on the following day as soon as the completion had taken place. It was of course important to the lawyers to be able to act quickly once the moneys had been transferred to the daughter, as they feared that she would not lose much time in transferring them out of the jurisdiction. Thus on the day before completion I was shown the lawyers' evidence and had the matter explained to me, and on the following day I was able, with the assurance of Mr. Hamblen that the completion had now taken place but that in all other respects nothing material had changed, to grant the injunction which I had already indicated I would in principle be willing to grant once the lawyers' cause of action had arisen. It seemed to me that this procedure, although perhaps unorthodox, successfully answered the real need which Mr. Justice Saville had sought to answer, and in a way which fell outside the technical reason, divorced from the merits of the case, which had caused the Court of Appeal to feel obliged to reject the procedure adopted by Mr. Justice Saville in *A v. B* and also at

[1999] Vol. I                LLOYD'S LAW REPORTS              939
Q.B. (Com. Ct.)                   Re Q's Estate                    RIX, J.

first instance by Mr. Justice Hobhouse in *The Veracruz I.*

When the parties subsequently came before me inter partes, Mr. Beazley, although anxious to submit, for the reasons discussed earlier in this judgment, that there was no jurisdiction to grant a *Mareva* injunction ancillary to arbitration in this case, nevertheless had no complaint about the procedure adopted by Mr. Hamblen and sanctioned by me at the ex parte stage. In my judgment, it is a valid procedure, but of course the Court will be astute to seek to ensure that it is used properly and without abuse.

In writing this, I am reminded by way of a postscript that the question of whether the rule in *The Veracruz I* covers the case of a contingent cause of action for an indemnity where the underlying liability has not yet been established or the indemnified has not yet suffered loss was considered by me in *Rowland v. Gulfpac Ltd.*, (unreported, July 24, 1995). The question of a cause of action for an indemnity is not I think this case, and the matter

there was addressed by me on an obiter basis, although after full argument. However, I considered the indemnity cases which contain an equity component (see at pp. 28-39 of the transcript) and concluded at pp. 38-39 as follows:

In my judgment none of the line of cases ending in *Zucker v. Tyndall Holdings Plc.* was concerned with equitable rights. In law it is clear on present authority that there must be a pre-existing cause of action in law, although the position may be said not to be fully worked out, perhaps, where there is a repudiatory breach. In equity, however, the position is more fluid and it is also clear that there is a line of authority that equity will lend a hand, in advance of the appropriate time at law, to prevent injustice where the right is clear and the danger is clear, too.

*Rowland v. Gulfpac* subsequently went to the Court of Appeal (sub nom. *Inoco Plc. v. Gulf USA Corporation*, unreported Jan. 24, 1997), but on a different point.

---